KAMALA D. HARRIS
Attorney General of California
JOHN P. DEVINE
Supervising Deputy Attorney General
AMY W. LO
Deputy Attorney General
State Bar No. 194308
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone: (415) 703-5524
 Fax:  (415) 703-1234
 E-mail: Amy.Lo@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SEAN KENSINGER,**<br><br>Plaintiff,<br><br>v.<br><br>**CALIFORNIA HIGHWAY PATROL, et al.,**<br><br>Defendants. | C 11-00885<br><br>**DECLARATION OF AMY W. LO IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**<br><br>Date:   June 7, 2012<br>Time:   2:00 p.m.<br>Courtroom:  8 (19th Floor)<br>Judge:  Honorable William Alsup<br><br>Trial Date: June 25, 2012 |

I, AMY W. LO, declare that I make this declaration based upon my personal knowledge, I

am competent to testify to all matters stated herein, and if called and sworn as a witness in this

matter, I would testify as follows:

1.    I am an attorney admitted to practice before the courts of the State of California

and before this Court.  I am currently employed as a Deputy Attorney General by the California

Department of Justice, Office of Attorney General.  I am the attorney of record for the defendants

1

1    in above-entitled action. On June 2, 2011, the plaintiff voluntarily dismissed this case against the

2    California Highway Patrol. The remaining defendants are CHP Officers Paul Craft and Jeffrey

3    Goodwin.

4          2.    A true and correct copy of the pages of Plaintiff's Responses to Defendant Paul

5    Craft's Interrogatories, Set One, which were cited in support of Defendants' Motions for

6    Summary Judgment and Partial Summary Judgment, are attached hereto as Exhibit A;

7          3.    A true and correct copy of the pages of Plaintiff's Responses to Defendant Jeffrey

8    Goodwin's Interrogatories, Set One, which were cited in support of Defendants' Motions for

9    Summary Judgment and Partial Summary Judgment, are attached hereto as Exhibit B;

10         4.    A true and correct copy of Plaintiff's Initial Disclosures (without the attached

11   documents) is attached hereto as Exhibit C. On January 26, 2012, I instructed my secretary to

12   serve plaintiff's counsel, Higa & Gipson, LLP, with Defendants' Supplemental Initial Disclosures

13   via U.S. Mail. As a courtesy, on the same day, I also emailed to copy of Defendants'

14   Supplemental Initial Disclosures to James Higa, Esq. In my email, I stated, "I noticed that

15   Plaintiff's Initial Disclosures had a significant amount of information that was to be supplied later

16   in his Computation of Damages section. Do you plan on supplementing Plaintiff's Initial

17   Disclosures?" Mr. Higa answered in the affirmative, but I have not received any Supplemental

18   Initial Disclosures from the plaintiff.

19         5.    A true and correct copy of the pages of the Deposition of Sean Kensinger, dated

20   March 29, 2012, which were cited in support of Defendants' Motions for Summary Judgment and

21   Partial Summary Judgment, are attached hereto as Exhibit D; and

22         6.    A true and correct copy of the pages from the testimony of Carol Sharp as shown

23   in the Reporter's Transcript of the Proceedings for the case of *People of the State of California v.*

24   *Sean Kensinger*, Superior Court of California in and for the County of Humboldt, Case No.

25   CR1002750C, which were cited in support of Defendants' Motions for Summary Judgment and

26   ///

27   ///

28   ///

2

1   Partial Summary Judgment, are attached hereto as Exhibit E.

2          I declare under penalty of perjury under the laws of the State of California that the

3   foregoing is true and correct and that this declaration was executed this **3RD** day of May, 2012,

4   in _____ SAN FRANCISCO _____, California.

5

6                                              AMY W. LO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              3

# EXHIBIT A

1  James Y. Higa, State Bar No. 225683
   Ronnie R. Gipson, Jr., State Bar No. 237673
2  HIGA & GIPSON, LLP
   55 New Montgomery Street, Suite 510
3  San Francisco, California 94105
   Telephone:    (415) 692-6520
4  Facsimile:    (415) 692-6522
   higa@higagipsonllp.com
5
   Attorneys for Defendant
6  SEAN KENSINGER

7

8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11

12
   SEAN KENSINGER,                      No.  CV 11-00885 WHA
13
              Plaintiff                 **PLAINTIFF SEAN KENSINGER'S**
14                                       **RESPONSES TO DEFENDANT PAUL**
   v.                                    **CRAFT'S SPECIAL**
15                                       **INTERROGATORIES, SET ONE**
   CALIFORNIA HIGHWAY PATROL; PAUL
16 CRAFT, individually and in his capacity as
   an officer for the California Highway Patrol,
17 J. GOODWIN, individually and in his
   capacity as an officer for the California
18 Highway Patrol, DOES 1-20, inclusive,

19            Defendants

20
   PROPOUNDING PARTY:         Defendant PAUL CRAFT
21
   RESPONDING PARTY:          Plaintiff SEAN KENSINGER
22
   SET NUMBER:                ONE
23

24

25                       **INTRODUCTION**

26      In responding to these Interrogatories, Plaintiff SEAN KENSINGER, the responding

27 party ("Plaintiff"), has furnished the propounding party with such information as is presently

28 available to Plaintiff, which may include hearsay and other forms of information which are

                                       1
PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT PAUL          CV 11-00885 WHA
CRAFT'S SPECIAL INTERROGATORIES, SET ONE

**SPECIAL INTERROGATORY NO. 15:**

As to each fact in YOUR answer to Interrogatory No. 14, IDENTIFY each and every PERSON with knowledge or information about that fact and each and every DOCUMENT supporting that fact.

**RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the phrase "reasonable certainty" as articulated in the predicate interrogatory. Plaintiff objects to this interrogatory on the ground it is impermissibly compound.

Without waiving the foregoing objection, Plaintiff responds as follows:

Not applicable to the interrogatory as phrased.

**SPECIAL INTERROGATORY NO. 16:**

Identify the PERSON or PERSONS that YOU that can state with reasonable certainty kicked YOU on the right side of YOUR torso during the INCIDENT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the phrase "reasonable certainty."

Without waiving the foregoing objection, Plaintiff responds as follows:

Plaintiff cannot be reasonably certain who kicked him during the INCIDENT.

**SPECIAL INTERROGATORY NO. 17:**

If YOU contend that more than one PERSON kicked YOU in the right side of YOUR torso during the INCIDENT, please state all facts describing how the kicks occurred, indicating how many kicks struck YOU, where on YOUR body the kick impacted, who kicked you each time, the time that elapsed between kicks, and where the PERSONS kicking YOU were standing in relation to each other, any other individual who was present, and YOU.

**RESPONSE TO SPECIAL INTERROGATORY NO. 17:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the phrase "reasonable certainty" as articulated in the predicate interrogatory. Plaintiff objects to this interrogatory on the ground it is impermissibly compound.

Without waiving the foregoing objection, Plaintiff responds as follows:

Although Plaintiff does not know who kicked him, he does not believe he was kicked by

9

more than one person in the INCIDENT.

**SPECIAL INTERROGATORY NO. 18:**

As to each fact in YOUR answer to Interrogatory No.17, IDENTIFY each and every PERSON with knowledge or information about that fact and each and every DOCUMENT supporting that fact.

**RESPONSE TO SPECIAL INTERROGATORY NO. 18:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the phrase "reasonable certainty" as articulated in the predicate interrogatory. Plaintiff objects to this interrogatory on the ground it is impermissibly compound.

Without waiving the foregoing objection, Plaintiff responds as follows:

Not applicable.

**SPECIAL INTERROGATORY NO. 19:**

At or about 6:15 p.m. on December 5, 2009, did you submit to a preliminary alcohol screening breath test at the Humboldt County Jail?

**RESPONSE TO SPECIAL INTERROGATORY NO. 19:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the term "preliminary alcohol screening breath test." Plaintiff objects to this interrogatory on the ground it assumes facts. Plaintiff objects to this interrogatory on the ground that it lacks proper foundation.

Without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff was not administered a "preliminary alcohol screening breath test" as described in this interrogatory.

**SPECIAL INTERROGATORY NO. 20:**

If your response to Interrogatory No. 19 is yes, please state the result or results of the preliminary alcohol screening breath test.

**RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the term "preliminary alcohol screening breath test." Plaintiff objects to this interrogatory on the ground it assumes facts. Plaintiff objects to this interrogatory on the ground that it lacks proper foundation.

be protected by the attorney-client privilege and attorney work-product doctrines. Plaintiff objects to this interrogatory on the ground that it is impermissibly overbroad and thus oppressive and burdensome.

Without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff has spoken with members of his immediate family, numerous friends, physicians, everyone in his counseling sessions, and many complete strangers with interest in the events of the subject incident.

DATED: February 21, 2012                    HIGA & GIPSON, LLP

By_____
JAMES Y. HIGA
Attorneys for PLAINTIFF
SEAN KENSINGER

PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT PAUL
CRAFT'S SPECIAL INTERROGATORIES, SET ONE                    CV 11-00885 WHA

**VERIFICATION**

I, SEAN KENSINGER, the undersigned, declare:

1.  That I am a party to the above-entitled action;

2.  That I have read the foregoing contained in this **PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT PAUL CRAFT'S SPECIAL INTERROGATORIES, SET ONE**;

3.  That these responses are true and correct to the best of my personal knowledge, except as to those responses stated upon information and belief, and as to those responses, I am informed and believe them to be correct;

4.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this __20__ day of February, 2012, at Wrightwood, California.


                                           _Sean Ken_____

                                           **SEAN KENSINGER**

1

# EXHIBIT B

James Y. Higa, State Bar No. 225683
Ronnie R. Gipson, Jr., State Bar No. 237673
HIGA & GIPSON, LLP
55 New Montgomery Street, Suite 510
San Francisco, California 94105
Telephone:    (415) 692-6520
Facsimile:     (415) 692-6522
higa@higagipsonllp.com

Attorneys for Defendant
SEAN KENSINGER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN KENSINGER,<br><br>      Plaintiff<br><br>v.<br><br>CALIFORNIA HIGHWAY PATROL; PAUL CRAFT, individually and in his capacity as an officer for the California Highway Patrol, J. GOODWIN, individually and in his capacity as an officer for the California Highway Patrol, DOES 1-20, inclusive,<br><br>      Defendants | No.  CV 11-00885 WHA<br><br>**PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY GOODWIN'S SPECIAL INTERROGATORIES, SET ONE** |

PROPOUNDING PARTY:      Defendant JEFFREY GOODWIN

RESPONDING PARTY:      Plaintiff SEAN KENSINGER

SET NUMBER:      ONE

## INTRODUCTION

In responding to these Interrogatories, Plaintiff SEAN KENSINGER, the responding party ("Plaintiff"), has furnished the propounding party with such information as is presently available to Plaintiff, which may include hearsay and other forms of information which are

1   Yes.

**SPECIAL INTERROGATORY NO. 2:**

2

3   If YOUR response to Interrogatory No. 1 is yes, please describe fully all of the mental,

4   physical, or emotional symptoms or manifestations of YOUR severe emotional distress,

5   including but not limited to the nature, extent, location, and duration of each symptom or

6   manifestation of YOUR severe emotional distress.

**RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

7

8   Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive

9   personal medical information.  Plaintiff objects to this interrogatory on the ground that it

10  assumes facts.

Without waiving the foregoing objections, Plaintiff responds as follows:

11  As a result of the subject incident, I experience significant anxiety when in the presence

12  of law enforcement officers or even when I see patrol vehicles on the street near me.  I suffer

13  from an extreme distrust of law enforcement which I had not felt prior to the subject incident.  I

14  suffer from recurring nightmares and restless sleep because I cannot control my anxiety over

15  what happened to me during the subject incident.  I will occasionally become so depressed that I

16  remain bedridden for periods of days, incapacitated because of my anxiety, rage and fear over

17  the subject incident.  I used to feel protected by law enforcement, but I now feel completely

18  betrayed.

**SPECIAL INTERROGATORY NO. 3:**

19

20  For each symptom or manifestation of YOUR severe emotional distress identified in

21  YOUR response to Interrogatory No. 2, please identify any medical, hospital, holistic,

22  therapeutic, psychiatric, psychological, or other health care treatment that you received for each

23  symptom or manifestation of YOUR severe emotional distress, including the dates of treatment,

24  the nature of the treatment, the names and addresses of providers and/or hospitals involved in

25  providing the treatment, and the diagnosis and prognosis, if known.

**RESPONSE TO SPECIAL INTERROGATORY NO. 3:**

26

27  Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive

28  personal medical information.  Plaintiff objects to this interrogatory on the ground that it

assumes facts.

PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY          CV 11-00885 WHA
GOODWIN'S SPECIAL INTERROGATORIES, SET ONE

Without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff has not treated with a mental health professional for his emotional distress injuries at this time.

**SPECIAL INTERROGATORY NO. 4:**

Has any provider that YOU identified in YOUR response to Interrogatory No. 3 advised that YOU may require future or additional treatment for any symptom or manifestation of YOUR severe emotional distress that YOU attribute to the INCIDENT?

**RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive personal medical information. Plaintiff objects to this interrogatory on the ground that it assumes facts.

Without waiving the foregoing objections, Plaintiff responds as follows:

Not applicable.

**SPECIAL INTERROGATORY NO. 5:**

If YOUR response to Interrogatory No. 4 is yes, state the name and address of each provider advising that future or additional treatment may be required, the complaints for which the treatment was advised, and the nature, duration, and estimated cost of the treatment.

**RESPONSE TO SPECIAL INTERROGATORY NO. 5:**

Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive personal medical information. Plaintiff objects to this interrogatory on the ground that it assumes facts.

Without waiving the foregoing objections, Plaintiff responds as follows:

Not applicable.

**SPECIAL INTERROGATORY NO. 6:**

At any time before the INCIDENT, did you ever develop or experience any emotional or mental conditions or disabilities associated with emotional distress?

**RESPONSE TO SPECIAL INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive personal medical information. Plaintiff objects to this interrogatory on the ground that it is overbroad as to time. Plaintiff objects to this interrogatory on the ground it is vague and

4

ambiguous in its use of the phrase "any emotional or mental conditions or disabilities associated with emotional distress."

Without waiving the foregoing objections, Plaintiff responds as follows:

No.

**SPECIAL INTERROGATORY NO. 7:**

If YOUR response to Interrogatory No. 6 is yes, please describe each emotional or mental condition or disability that you developed or experience, when and how the condition or disability arose, the dates and types of medical, hospital, holistic, therapeutic, psychiatric, psychological, or other health care treatment that you received for the condition or disability, the names and addresses of providers and hospitals involved, and the diagnosis and prognosis, if known.

**RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

Plaintiff objects to this interrogatory on the ground that it seeks private and sensitive personal medical information. Plaintiff objects to this interrogatory on the ground that the predicate interrogatory is overbroad as to time. Plaintiff objects to this interrogatory on the ground it is vague and ambiguous in its use of the phrase "any emotional or mental condition or disability."

Without waiving the foregoing objections, Plaintiff responds as follows:

Not applicable.

**SPECIAL INTERROGATORY NO. 8:**

How many times in the last eighteen (18) years have you been detained or arrested by law enforcement officers?

**RESPONSE TO SPECIAL INTERROGATORY NO. 8:**

Plaintiff objects to this interrogatory on the ground it assumes facts. Plaintiff objects to this interrogatory on the ground it is impermissibly compound. Plaintiff objects to this interrogatory on the ground it is overbroad as to time. Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the term "detained." Plaintiff objects to this interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence and only serves to harass Plaintiff.

Without waiving the foregoing objections, Plaintiff responds as follows:

PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY     CV 11-00885 WHA
GOODWIN'S SPECIAL INTERROGATORIES, SET ONE

Aside from the subject incident, Plaintiff recalls being arrested four times. As for detentions, Plaintiff has been "detained" several times over the last 18 years for purported vehicle code violations.

**SPECIAL INTERROGATORY NO. 9:**

For each detention or arrest in YOUR response to Interrogatory No. 8, please state the date and time of detention and/or arrest, the city and state where the detention and/or arrest occurred, the names of the officers and law enforcement agency involved, the circumstances surrounding the detention and/or arrest, and whether YOU were released or charged with a crime.

**RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

Plaintiff objects to this interrogatory on the ground that the predicate interrogatory assumes facts. Plaintiff objects to this interrogatory on the ground it is impermissibly compound. Plaintiff objects to this interrogatory on the ground that the predicate interrogatory is overbroad as to time. Plaintiff objects to this interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence and only serves to harass Plaintiff.

Without waiving the foregoing objections, Plaintiff responds as follows:

Arrest: approximately Summer 1994; Ashland, OR, Ashland Police Department, charged with Rioting, charges dismissed;

Arrest: late 1990s; Newark, CA; Newark Police Department, charged with petty theft;

Arrest: approximately June 2002; Fremont, CA, Fremont Police Department; charged with a misdemeanor resisting arrest when leaving a bowling alley running away from people who had attacked me;

Arrest: approximately Fall 2007, Santa Clara, CA, Santa Clara Police Department; charged with offenses when I was hit with a chair while trying to break up a fight involving a friend who had returned from military service in Iraq.

**SPECIAL INTERROGATORY NO. 10:**

Other than this INCIDENT, have you had any other negative or unsatisfactory encounters with law enforcement officers or agencies?

**RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its

6

YOUR direct supervisor and his or her job title.

**RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

Plaintiff objects to this interrogatory on the ground that it is overbroad as to time.

Without waiving the foregoing objection, Plaintiff responds as follows:

For the past 8 years, Plaintiff has solely owned and operated Aiden Landscape Design.

**SPECIAL INTERROGATORY NO. 21:**

State the total income you have lost and business expenses that you have had to incur to date as a result of the INCIDENT, including how YOU calculated these amounts.

**RESPONSE TO SPECIAL INTERROGATORY NO. 21:**

Plaintiff objects to this interrogatory on the ground that it is impermissibly compound. Plaintiff objects to this interrogatory on the ground that it is duplicative.

Without waiving the foregoing objections, Plaintiff responds as follows:

Approximately $11,000. This amount is calculated using a review of Plaintiff's bank account statements identifying a depletion of both accounts totaling in roughly that amount. The $11,000.00 reflects only those out-of-pocket costs Plaintiff was unable to avoid due to payment of workers to compensate for his inability to work, as well as out-of-pocket costs associated with costs of living—even though he was stripped of practically any-and-all income because of his officer-inflicted injuries. Further review of earlier business account entries illustrates a business which, in the 7 months prior to the subject incident, earned an average of $3,000.00 per month in accounts receivable which Plaintiff could no longer pursue in the short term because of his 6 month period of injury and recovery.

Plaintiff reserves the right to supplement these responses to the extent additional investigation and/or discovery yields additional information.

**SPECIAL INTERROGATORY NO. 22:**

As to each fact in YOUR answer to Interrogatory No. 21, IDENTIFY each and every PERSON with knowledge or information about that fact and each and every DOCUMENT supporting that fact.

**RESPONSE TO SPECIAL INTERROGATORY NO. 22:**

Plaintiff objects to this interrogatory on the ground that the predicate interrogatory is impermissibly compound. Plaintiff objects to this interrogatory on the ground that the predicate

12

1 interrogatory is duplicative.

2     Without waiving the foregoing objections, Plaintiff responds as follows

3     Michelle Hyde, Patrick Hyde, Gabe Camacho, Justin Collins, Loren Kensinger, Colleen

4 Kensinger.

5     Plaintiff reserves the right to supplement these responses to the extent additional

6 investigation and/or discovery yields additional information.

7 **SPECIAL INTERROGATORY NO. 23:**

8     Please IDENTIFY all PERSONS that you have paid for labor, whether on full-time or

9 part-time basis or as contractor or employee, at any time in your landscaping business.

10 **RESPONSE TO SPECIAL INTERROGATORY NO. 23:**

11     Plaintiff objects to this interrogatory on the ground that it is grossly overbroad. Plaintiff

12 objects to this interrogatory on the ground that it is not reasonably calculated to lead to the

13 discovery of admissible evidence.

14     Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

15     Plaintiff hired day laborers on a cash basis when necessity warranted. Plaintiff was the

16 sole employee of, and performed virtually all work for, Aiden Landscape Design for the entirety

17 of the damages period at issue in this case. Plaintiff hired employees within the last 6 months

18 after moving his business to Southern California; however such period has no bearing on the

19 issues presented in this case and does not constitute valid admissible evidence.

20 **SPECIAL INTERROGATORY NO. 24:**

21     Please IDENTIFY all work assignments that you were unable to perform due to injuries

22 that you contend you sustained during this incident, including the name and address of person

23 desiring to use your service, the nature and scope of work to be performed, and the date and

24 times of the assignment.

25 **RESPONSE TO SPECIAL INTERROGATORY NO. 24:**

26     Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its

27 use of the term "work assignments." Plaintiff objects to this interrogatory on the ground it seeks

28 information violative of the privacy rights of third parties.

    Without waiving the foregoing objections, Plaintiff responds as follows:

    Plaintiff was forced to decline new work requested by verbal inquiry by numerous

**PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY GOODWIN'S SPECIAL INTERROGATORIES, SET ONE**      CV 11-00885 WHA

former neighbors located on Cobb Road in Dinsmore, CA, including flattening land, building fences, hauling lumber, stone work, digging holes and other land improvement work to the extent he was the sole employee and worker for Aiden Landscape Design. As stated earlier, Plaintiff does not recall the names of the people who requested this work.

Plaintiff reserves the right to supplement these responses to the extent additional investigation and/or discovery yields additional information.

**SPECIAL INTERROGATORY NO. 25:**

As to each fact in YOUR answer to Interrogatory No. 24, IDENTIFY each and every PERSON with knowledge or information about that fact and each and every DOCUMENT supporting that fact.

**RESPONSE TO SPECIAL INTERROGATORY NO. 25:**

Plaintiff objects to this interrogatory on the ground that it is vague and ambiguous in its use of the term "work assignments" as articulated in the predicate interrogatory. Plaintiff objects to this request on the ground it is impermissibly compound and thus overbroad in scope.

Without waiving the foregoing objections, Plaintiff responds as follows:

Michelle Hyde, Patrick Hyde, Gabe Camacho, Justin Collins, Loren Kensinger, Colleen Kensinger.

Because most of Aiden Landscape Design's work was done per verbal inquiry prior to mid-late 2011, these "work assignments" were not reduced to a writing, whether a contract or otherwise.

DATED: February 21, 2012          HIGA & GIPSON, LLP

By _____
JAMES Y. HIGA
Attorneys for PLAINTIFF
SEAN KENSINGER

PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY
GOODWIN'S SPECIAL INTERROGATORIES, SET ONE                    CV 11-00885 WHA

## VERIFICATION

I, SEAN KENSINGER, the undersigned, declare:

1.     That I am a party to the above-entitled action;

2.     That I have read the foregoing contained in this **PLAINTIFF SEAN KENSINGER'S RESPONSES TO DEFENDANT JEFFREY GOODWIN'S SPECIAL INTERROGATORIES, SET ONE;**

3.     That these responses are true and correct to the best of my personal knowledge, except as to those responses stated upon information and belief, and as to those responses, I am informed and believe them to be correct;

4.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of February, 2012, at Wrightwood, California.


                                                    _Sean Kent_____

                                                    **SEAN KENSINGER**

1

# EXHIBIT C

James Y. Higa, State Bar No. 225683
Ronnie R. Gipson, Jr., State Bar No. 237673
HIGA & GIPSON, LLP
71 Stevenson Street, 4th Floor
San Francisco, California 94105
Telephone:     (415) 655-6820
Facsimile:      (415) 655-6821

Attorneys for Defendant
SEAN KENSINGER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN KENSINGER,<br><br>Plaintiff<br><br>v.<br><br>CALIFORNIA HIGHWAY PATROL; PAUL CRAFT, individually and in his capacity as an officer for the California Highway Patrol, J. GOODWIN, individually and in his capacity as an officer for the California Highway Patrol, DOES 1-20, inclusive,<br><br>Defendants | No.   CV 11-00885 WHA<br><br>**PLAINTIFF SEAN KENSINGER'S INITIAL DISCLOSURES** |

Plaintiff SEAN KENSINGER ("Kensinger") makes the following Initial Disclosures pursuant to Fed. R. Civ. Proc. 26(a)(1):

## I.    WITNESSES

The following witnesses may have pertinent information regarding the facts underlying this case:

1.    Plaintiff Sean Kensinger (c/o Higa & Gipson, counsel of record);

2.    Justin Collins;

3.    Geronimo Gardener;

4.    Sarah Dodier;

1   5.      Defendant CHP Officer Paul Craft;

2   6.      Defendant CHP Officer J. Goodwin;

3

4   It should be noted that several of the above-named individuals served as testimonial

5   witnesses in the criminal court action arising from the events underlying this litigation.  Once

6   any additional information is discovered regarding these and any other witnesses unknown to

7   Plaintiff at this time, these disclosures will be supplemented accordingly.

8

9   **II.    DOCUMENTS/MATERIALS RELEVANT TO DISPUTED FACTS**

10   The following documents are known to Plaintiff at this time.  Plaintiff understands the

11   ongoing obligation to supplement these disclosures upon the discovery and/or receipt of

12   additional documents and materials.

13   1.      California Highway Patrol Incident Report #01170KL, dated December 5, 2009;

14   2.      Department of Motor Vehicles Administrative Per Se Hearing Notification of

15           Findings and Decision, dated January 7, 2010;

16   3.      Kaiser Permanente Medical Record, dated December 9, 2009;

17   4.      Kaiser Permanente Medical Record, dated January 26, 2010;

18   5.      Kaiser Permanente Medical Record, Radiology Report, dated May 10, 2010;

19   6.      13 Color Photographs taken between December 7, 2009, and December 13, 2009,

20           of Plaintiff's left elbow and arm;

21   7.      Heritage Bank of Commerce financial statements;

22   8.      United Services Credit Union financial statements;

23   9.      Transcript of trial testimony of Defendant CHP Officer Paul Craft (not currently

24           in possession of Plaintiff's counsel);

25   10.     Transcript of trial testimony of Defendant CHP Officer J. Goodwin (not currently

26           in possession of Plaintiff's counsel);

27   11.     Transcript of trial testimony of Justin Collins (not currently in possession of

28           Plaintiff's counsel);

2

12. Transcript of trial testimony of Sarah Dodier (not currently in possession of Plaintiff's counsel);

13. Surveillance video of "sally port" during detention of Plaintiff (not currently in possession of Plaintiff's counsel);

## III. COMPUTATION OF DAMAGES

Plaintiff is in the process of requesting additional documents and materials indicating the total value of medical treatment and physical therapy for his injuries sustained in the subject incident.

Additionally, Plaintiff, a landscape contractor by trade, is calculating (a) how much work he lost, and (b) how much he paid for extra help performing on existing contracts during his approximately 8-10 weeks of recovery.

## IV. INSURANCE AGREEMENTS

Plaintiff is unaware of any applicable insurance agreements at this time.

DATED: May 31, 2011

HIGA & GIPSON, LLP

By
JAMES Y. HIGA
Attorneys for PLAINTIFF
SEAN KENSINGER

1

## PROOF OF SERVICE

2

3      I, the undersigned, declare that I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  I am an employee of Higa & Gipson LLP and my business address is 71 Stevenson Street, 4th Floor, San Francisco, CA 94105.  On the date set forth below, I served the following documents:

4

5

6      ## PLAINTIFF SEAN KENSINGER'S INITIAL DISCLOSURES

7

8      by placing the documents listed above in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed as set forth below:

9

10      ## SEE ATTACHED SERVICE LIST

11

12      I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and in the ordinary course of business correspondence would be deposited with the U.S. Postal Service the same day it was placed for collection and processing.

13

14

15

16      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

17      Executed on May 31, 2011 at San Francisco, California.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

Case3:11-cv-00885-WHA  Document27  Filed05/03/12  Page26 of 76  CERTIFIED COPY

Kensinger vs. CHP      Sean Kensinger                3/29/12

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4   SEAN KENSINGER,

5            Plaintiff,

6   v.                              No. CV 11-00885 WHA

7   CALIFORNIA HIGHWAY PATROL;
    PAUL CRAFT, individually and
8   in his capacity as an officer
    for the California Highway Patrol,
9   J. GOODWIN, individually and in
    his capacity as an officer
10  for the California Highway Patrol,
    DOES 1-20, inclusive,

11

12            Defendants.
    _____/

13

14

15

16          DEPOSITION OF SEAN KENSINGER

17           Thursday, March 29, 2012

18

19

20

21  REPORTED BY:
    DONIELLE DEL CARLO, CSR 10476

22

23            DE SOUZA & ASSOCIATES
           Certified Shorthand Reporters
24              P.O. BOX 1675
            San Mateo, California 94401
25              (650)341-2671

Kensinger vs. CHP     Sean Kensinger                    3/29/12

```
 1                   A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF SEAN KENSINGER:

 4                   HIGA & GIPSON, LLP

 5                   by:  RONNIE R. GIPSON, JR., ESQ.

 6                   55 New Montgomery Street, Suite 510

 7                   San Francisco, California 94105

 8                   (415)692-6520

 9    FOR THE DEFENDANT CALIFORNIA HIGHWAY PATROL:

10                   OFFICE OF THE ATTORNEY GENERAL

11                   by:  AMY LO, ESQ.

12                   455 Golden Gate Avenue, 11th Floor

13                   San Francisco, California 94102

14                   (415)703-5500

15    Also Present:  Christopher Burgess, Videographer
                     1350 Old Bayshore Highway
16                   Burlingame, California 94010

17

18                        ---oOo--

19

20

21

22

23

24

25
                                                        2
```

Case3:11-cv-00885-WHA   Document27   Filed05/03/12   Page28 of 76

Kensinger vs. CHP      Sean Kensinger                3/29/12

1                          I N D E X

2    EXAMINATION BY:                                    PAGE

3        Ms. Lo                                          05

4        Mr. Gipson                                     278

5

6                           - - -

7

8

9                         EXHIBITS

10   DEFENDANTS':                                       PAGE

11

12       4        PLAINTIFF SEAN KENSINGER'S RESPONSES....36
                  TO DEFENDANT PAUL CRAFT'S SPECIAL
13                INTERROGATORIES, SET ONE

14       5        PLAINTIFF SEAN KENSINGER'S RESPONSES....38
                  TO DEFENDANT JEFFREY GOODWIN'S SPECIAL
15                INTERROGATORIES, SET ONE

16       6        Government Claims Form..................73
                  Claim No.: 590247

17

         7        Diagram completed by witness of.........111
18                incident scene

19       8        Photo of Billy Club.....................236

20       9        Photo of MAG-LITE.......................237

21      10        Photo of ASP............................237

22                        ---o0o---

23

24

25

                                                          3

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page29 of 76

Kensinger vs. CHP      Sean Kensinger                    3/29/12

1          BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition, and on Thursday, March 29, 2012,

3    commencing at the hour of 9:35 a.m. thereof; at

4    455 Golden Gate Avenue, 11th Floor, San Francisco,

5    California, before me, DONIELLE DEL CARLO, a Certified

6    Shorthand Reporter in the State of California,

7    personally appeared

8                      SEAN KENSINGER,

9    called as a witness herein; and the said witness, being

10   by me first duly sworn, was thereupon examined and

11   testified as is hereinafter set forth.

12                       ---o0o---

13

14          THE VIDEOGRAPHER:  Good morning, we are on the

15       video record at 9:34 a.m.  I am Christopher Burgess

16       with Circle Video Productions, 1350 Old Bayshore

17       Highway, Burlingame, California.

18          This is a matter pending before the United

19   States District Court for the Northern District of

20   California in the case captioned Sean Kensinger versus

21   the California Highway Patrol, et al., Case No.

22   CV 11-00885 WHA.

23          This is the beginning of Master No. 1 of

24   Volume 1 of the deposition of Sean Kensinger on

25   March 29, 2012 at the Office of the Attorney General,

                                                            4

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page30 of 76

Kensinger vs. CHP        Sean Kensinger                    3/29/12

1     455 Golden Gate Avenue, Suite 11000, San Francisco,

2     California.  It is being taken on behalf of the

3     Defendants.

4          Will counsel present please identify yourself

5     for the record?

6          MR. GIPSON:  Ronnie Gipson for the Defendant.

7     For the Plaintiff.  Sorry.

8          MS. LO:  Amy Lo for Defendants.

9          THE VIDEOGRAPHER:  The court reporter today is

10    Donielle Del Carlo of De Souza & Associates.

11    Please swear the witness and begin.

12                 (Witness sworn.)

13              EXAMINATION BY MS. LO

14         MS. LO:  Good morning, Mr. Kensinger.  We've

15    met several times before.  Thank you for coming

16    back to my office.

17         THE WITNESS:  We've met once, I believe.

18         MS. LO:  Yes.  And then again this morning.

19    So that's how I'm counting it.

20         THE WITNESS:  All right.  All right.

21         MS. LO:  Q.  So could you state and spell your

22    name for the record?

23    A.    My name is Sean Patrick Kensinger.  S-E-A-N,

24    P-A-T-R-I-C-K, and Kensinger, K-E-N-S-I-N-G-E-R.

25    Q.    And have you ever gone by any other names?

                                                          5

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1        A.    Correct.

2        Q.    Okay.  Now, did your tiredness have any effect

3    on your driving while you were heading away from the

4    Arcata Airport towards Dinsmore?

5        A.    Yes.

6        Q.    Okay.  And what was the effect that your

7    tiredness had on your driving while you were leaving the

8    Arcata Airport heading towards Dinsmore?

9        A.    I believe I missed the mile-per-hour sign, and

10   I hit the bumps on the side of the road once.  Or maybe

11   it was the middle-of-the-road bumps, but I was not in my

12   lane at one point.

13       Q.    Anything else?

14       A.    Geronimo told me to stop swerving.

15       Q.    Did you notice that you were swerving?

16       A.    Yes.

17       Q.    And do you think that the swerving -- was the

18   swerving of such a magnitude that it would be apparent

19   to other drivers, in your opinion?

20            MR. GIPSON:  Objection.  Calls for

21       speculation.

22            THE WITNESS:  I couldn't -- I couldn't answer

23       that.  I wouldn't know.

24            MS. LO:  Okay.

25       Q.    But to the passengers inside your truck it was

                                                         107

Kensinger vs. CHP      Sean Kensinger                    3/29/12

1   noticeable, the swerving?

2              MR. GIPSON:  Objection.  Objection.  That

3         misstates testimony.  He only testified as to one

4         passenger.

5              MS. LO:  Okay.

6         Q.   But to Geronimo Gardner, who was inside your

7    truck, the swerving was noticeable; is that correct?

8         A.   He told me to stop swerving.

9         Q.   Okay.  You also mentioned your eyes dropping.

10        A.   Yes.

11        Q.   Okay.  So I'm going to list what you've told

12   me so far about the effect of tiredness on your driving

13   from the Arcata Airport to Dinsmore.  You mentioned that

14   you missed a speed limit sign on the safety corridor,

15   that you were sometimes not in your lane -- or one time

16   not in your lane?

17        A.   I remember hitting bumps once, and right after

18   that Geronimo said, Stop swerving.

19        Q.   Okay.  You were swerving?

20        A.   I drifted off my lane.

21        Q.   Okay.  And your eyes were drooping?

22        A.   I was tired.

23        Q.   Were your eyes drooping?

24        A.   Yes.

25        Q.   What else -- what other manifestations were

                                                        108

Case3:11-cv-00885-WHA   Document27   Filed05/03/12   Page33 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1          just trying to find out your relationship with law

2          enforcement, that's where I'm getting at with this.

3                  THE WITNESS:  My lawyer told me I should plead

4          to the resisting arrest, so I did.

5                  MS. LO:  Okay.

6          Q.    But in that instance you were not afraid of

7    the officer?  And I'm talking about in 2007, 2008.

8          A.    Correct.  I was relieved that there was

9    officers there.  Once I realized there was officers

10   there, I stopped running.

11         Q.    Now, you've had numerous encounters with law

12   enforcement officers prior to this incident on

13   December 5th, 2009; is that correct?

14         A.    Correct.

15         Q.    Can you estimate for me the amount of time?

16         A.    The biggest amount of time was the time I was

17   stopped on the Canadian border.

18         Q.    Mm-hmm.

19         A.    For a warrant I had in Oregon which I did not

20   know about.

21                MR. GIPSON:  She's asking for the number of

22         times.

23                THE WITNESS:  Yeah.  I'm trying to explain

24         that during that time they bussed me down to

25         Ashland, and I was at 50 jails, booked in.  I have

                                                              135

Case3:11-cv-00885-WHA   Document27   Filed05/03/12   Page34 of 76

Kensinger vs. CHP      Sean Kensinger                    3/29/12

1        had extensive experience with getting handcuffed,

2        unhandcuffed, fingerprinted, booked into jail.

3        Because we had to stop at every single jail on

4        Highway 5 from the border of Canada to the border

5        of California.

6              MS. LO:  Okay.

7        Q.   So just counting that as being one time --

8        A.   Okay.

9        Q.   -- can you tell me overall prior to this

10   December 5th, 2009 incident, how many contacts you've

11   had with law enforcement that were either detentions or

12   arrests?

13       A.   Six, around there.

14       Q.   Okay.  And in none of those situations were

15   you ever afraid of the law enforcement officers; is that

16   correct?

17       A.   No.

18       Q.   Okay.  So where we left off is that you told

19   Officer Craft that you had not been drinking.  What was

20   the next thing that happened?

21       A.   He called me a fucking liar.

22       Q.   Okay.

23       A.   And said, Go sit over there, and motioned with

24   his flashlight exactly where I should sit and walked

25   with me over towards it.

                                                        136

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page35 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1   far as you can tell --

2        A.   Yes.

3        Q.   -- as the first blow?

4        A.   Yes.  I saw him hit me the second time.

5        Q.   Okay.  Did you hear any -- strike that.

6             As this was happening, as you were being hit

7   by Officer Craft, did you hear either Geronimo Gardner

8   or Justin Collins or the officer in the SUV say

9   anything?

10       A.   No.  He was yelling at me, that's all I heard.

11       Q.   Okay.  And what was the thing that happened

12  next after you were struck a second time?

13       A.   I think my knees gave out because I was going

14  down, and I hit my knees, I was still watching him as I

15  go down, and I see he's rearing back for another shot at

16  me, so I try to throw myself on to the ground, and he

17  swung again, and it just was a glancing blow off the top

18  of my shoulder here and my head.

19       Q.   Okay.  Now, when you say that your knees gave

20  out, is it because of the pain that you were feeling?

21       A.   Yeah --

22       Q.   Or was it because Officer Craft struck you by

23  the knees?

24       A.   No.  It was from the force of his strikes to

25  my arm.

                                                  159

1     Q.   Okay.

2     A.   And the pain I was feeling.

3     Q.   Now, you indicated that prior to the third

4  blow Officer Craft was rearing back and -- before he

5  struck you on the shoulder?

6     A.   Yes.

7     Q.   Did he use that same type of movement when he

8  struck you the first time?  In other words, rearing back

9  and then striking you?

10     A.   I didn't notice the first hit.  I was in the

11  process, kind of head down, turning, you know, and then

12  it just happened.

13     Q.   Okay.

14     A.   And then I looked at him, and I could see his

15  face, and he's still screaming at me, so I grab my arm,

16  and he hits me again, and then I see him rearing back

17  again, so I go down.  I don't know if it was voluntary

18  or not, but I went down.

19     Q.   So prior to the second hit, Officer Craft was

20  also rearing back prior to hitting you; is that correct?

21     A.   Yes.

22     Q.   Okay.  So now you're on your knees, and you've

23  been hit a third time.  Do I have that sequence correct?

24     A.   It was more like I hit my knees and flopped

25  right to my belly.

160

1       Q.    And when the officer was asking you questions

2   he was sitting in the driver's seat of the Durango?

3       A.    Correct.

4       Q.    Okay.  Were the windows down on the Durango?

5       A.    He had his door open, and I don't know about

6   windows being down.

7       Q.    So while you were shouting about this not

8   being right and you can't do this to us, the officer was

9   still in the car with the door open?

10      A.    Yes.

11      Q.    In the Durango with the door open.  Okay.

12            What else happened?

13      A.    I don't know.  I was real agitated, my arm

14  went from being numb to being extremely painful, so I

15  was yelling at them, and then the door opened, and

16  that's when I saw Officer Goodwin.

17      Q.    Okay.  So Officer Goodwin opened the door

18  while you were yelling inside the Durango?

19      A.    Yes.  I wasn't continually yelling, but I

20  would say things like, I do remember saying, I'm Charlie

21  as fuck, you can't do this.

22      Q.    Mm-hmm.  Okay.

23      A.    Which I'm sure you don't know what that means

24  but.

25      Q.    No.  I don't know what that means.

188

Case3:11-cv-00885-WHA   Document27   Filed05/03/12   Page38 of 76

Kensinger vs. CHP        Sean Kensinger                    3/29/12

1        A.   In Oakland when they say you're Charlie is

2   when you haven't done anything wrong.

3        Q.   Okay.  Did Justin say anything?

4        A.   He might have told me to calm down.

5        Q.   Okay.  At this time were you still afraid of

6   the officers, or were you angry?  What were you feeling

7   at that time?

8        A.   Once I saw that there was other officers on

9   the scene I became angry.  I wanted them to know how

10  badly I was treated by the other officer.

11       Q.   Okay.  So did you think that there might be --

12  that the officer -- Officer Craft and the SUV officer

13  might be covering up what they had done, is that what

14  you were thinking?

15       A.   Not at that moment.

16       Q.   Okay.  But you were just saying you saw other

17  law enforcement officers, and you wanted them to help

18  you in your situation, correct?

19       A.   Yes.

20       Q.   So as you were yelling the door opened and you

21  saw Officer Goodwin?

22       A.   Yes.  He opened the door.

23       Q.   Okay.  Tell me what happened.

24       A.   I turned to him and I said, Are you here to

25  save me from these maniac cops?

                                                        189

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page39 of 76

Kensinger vs. CHP       Sean Kensinger                3/29/12

1       Q.    What did he say?

2       A.    He said, Follow me.

3       Q.    Okay.  What happened next?

4       A.    I followed him over to his car, and he opened

5    his back door, and I sat down with my knees out the door

6    so it was comfortable for my arm because I was

7    handcuffed.  So I wouldn't have to lean back.  I had my

8    knees out, sitting sideways in the backseat.  He had the

9    door open.  He kneeled down and got eye to eye with me.

10      Q.    Did you ask -- did you tell him about your

11   arm?

12      A.    Yeah.  On the way over.

13      Q.    And did you ask him to position you that way

14   or?

15      A.    No.

16      Q.    But he allowed you to sit that way?

17      A.    Yeah.  He said that's good.

18      Q.    Okay.  What did you tell Officer Goodwin about

19   your arm as you were heading over to his patrol car?

20      A.    I said, That big, fat, bald cop hit me.

21      Q.    Okay.  And did Officer Goodwin respond?

22      A.    He said, He says you were resisting.

23      Q.    Okay.  Now, when you approached Officer

24   Goodwin's patrol car as you were walking with him, it

25   was parked where you've indicated on Exhibit 7, correct?

190

1        A.    To the best of my knowledge, yes.

2        Q.    Okay.  Now, did he have any emergency lights

3    on in his patrol vehicle?

4        A.    No.

5        Q.    And I read your criminal trial testimony, and

6    you indicated at that time that Officer Goodwin arrived

7    about 20 minutes after you first encountered Officer

8    Craft.  Is that consistent with your memory now?

9        A.    At the minimum, 20 minutes.

10        Q.    Okay.  But it could have been longer?

11        A.    Yes.

12        Q.    Before Officer Craft -- before you saw Officer

13    Goodwin?

14        A.    Correct.

15        Q.    Now, did Officer Goodwin ever hit or kick you?

16        A.    No.

17        Q.    Did he ever hit you?

18        A.    No.

19        Q.    Okay.  In fact, you thought that he was there

20    to save you from these other officers, correct?

21        A.    I thought he could maybe help me.

22        Q.    Okay.  And do you have any complaints about

23    the way Officer Goodwin treated you?

24        A.    Yes.

25        Q.    Okay.  And what was that?

                                                        191

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page41 of 76

Kensinger vs. CHP    Sean Kensinger                    3/29/12

1       A.    He would repeat back things I didn't say and

2    said I said them.

3       Q.    Anything other than that?

4       A.    No.

5       Q.    So Officer Goodwin would ask you questions,

6    you would answer them?

7       A.    Mm-hmm.

8       Q.    And Officer Goodwin would purport to repeat

9    back to your answer, but it was not the answer you gave,

10   correct?

11      A.    Correct.

12      Q.    And did you tell him that at the time that you

13   were sitting there?

14      A.    Yes.

15      Q.    But did he just ignore you?

16      A.    Yes.

17      Q.    Okay.  Is that the only complaint you have

18   about Officer Goodwin's behavior?

19      A.    At that moment, yes.

20      Q.    What do you mean by that?  What other moments?

21      A.    Well, when he was on trial lying.

22      Q.    Okay.  But other than the trial -- we're just

23   talking about the incident, let's set aside the trial --

24   did you have any other complaints about the -- about

25   your interaction with Officer Goodwin?

                                                        192

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page42 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1      A.   When he gave me the breathalyzer at the jail,

2  he told me he didn't like my tongue and didn't let me

3  see the second results.

4      Q.   Okay.  I don't understand.  He didn't like

5  your tongue?

6      A.   That's what he says.  It doesn't like your

7  tongue.

8      Q.   Okay.  So he was saying the breathalyzer --

9      A.   Yes.

10      Q.   Okay.  Do you know what he meant by that?

11      A.   Nope.

12      Q.   But you took offense from that?

13      A.   Yeah.  Because I could see it said zero zero.

14      Q.   So your complaint about Officer Goodwin is not

15  so much what he said, but that he didn't show you a

16  zero zero result on the breathalyzer; is that correct?

17           MR. GIPSON:  Objection.  I think that

18        misstates his testimony.

19           MS. LO:  Okay.  I need to understand what it

20        is that is the problem.

21      Q.   What is it about Officer Goodwin that you are

22  unhappy about?  You first told me that when he was

23  interviewing you, you felt that what he repeated back to

24  you as your statement was not the statement that you

25  made, correct?

                                                  193

1         A.    Correct.

2         Q.    That's one thing.

3               Now, the second thing is you said it had

4    something to do with the breathalyzer test and Officer

5    Goodwin saying the breathalyzer doesn't like your

6    tongue?

7         A.    Yes.

8         Q.    Did you take offense at that?

9         A.    Yes.

10        Q.    Okay.  What was -- what did you interpret that

11   statement to mean?

12        A.    I could see he was upset that it read

13   zero-zero and that I saw it.

14        Q.    Okay.  So did you believe that Officer Goodwin

15   was hiding the results of your breathalyzer test?

16        A.    I believe he didn't want me to see what the

17   breathalyzer indicated after I blew into it the first

18   time.

19        Q.    Did he ever show you any of the results of the

20   breathalyzer tests?

21        A.    No.

22        Q.    Okay.  So you believe that Officer Goodwin

23   didn't want to show you the results of the breathalyzer

24   test, correct?

25        A.    Correct.

                                                          194

1       Q.    Okay.

2       A.    The second time I breathed into it, he pulled

3    it away so quick that there was no chance for me to see

4    any kind of readout.

5       Q.    Okay.  Did you ask to see the readout?

6       A.    No.

7       Q.    Okay.  Other than these two instances we've

8    talked about, any other complaints about Officer

9    Goodwin's conduct?

10      A.    No.

11      Q.    Okay.  And we are setting aside the trial?

12      A.    I understand.

13      Q.    Okay.  Thank you, very much.

14            Now, Officer Goodwin has now brought you to

15   his patrol car, he sat you in the backseat, the door's

16   open, you were sitting in as comfortable a position as

17   you can be while you were handcuffed.  What happens

18   next?

19      A.    He was kneeling so he could see me eye to eye.

20   He told me, He says he was resisting, and I said, That's

21   bullshit, no one was resisting.  What's wrong with those

22   cops?  Are they on steroids?

23      Q.    Okay.  "He says he was resisting."  Was that

24   Officer Goodwin saying to you that Officer Craft said

25   you were resisting?

                                                        195

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page45 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1    tell you for certain.

2        Q.   Okay.

3        A.   I don't recall at this point.

4        Q.   Okay.  That's fine.

5        A.   These are not photos I like to look at.

6        Q.   Now, let's look at the last photo which is

7    KEN 000085, and it's a photo dated December 13th, 2009.

8    Do you know who took this photo?

9        A.   I think I took that one.

10       Q.   And do you know where it was taken?

11       A.   It was my Hayward home.

12       Q.   Okay.  Thank you.

13            Now, these injuries that we just looked at in

14   these photos, they were caused by an officer

15   deliberately striking you with a baton; is that correct?

16       A.   That is correct.

17       Q.   These injuries were not inflicted accidently;

18   is that correct?

19       A.   No.

20       Q.   They were not accidental?

21       A.   No.  I was struck with baton by Officer Craft.

22       Q.   Intentionally?

23       A.   Yes.

24       Q.   Okay.  So this lawsuit is not about that you

25   accidently got hurt while you were arrested; is that

                                                          234

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page46 of 76

Kensinger vs. CHP      Sean Kensinger                    3/29/12

1  correct?

2      A.   Correct.

3      Q.   It's about intentional use of force against

4  you?

5      A.   Yes.

6           MS. LO:  Okay.  Now, you know, I think we're

7      going to take a break right now for the videotape

8      to be changed and then we'll start again.

9           THE VIDEOGRAPHER:  We're going off the video

10     record.  The time is 4:19 p.m.

11                    (Videotape change.)

12          THE VIDEOGRAPHER:  We are back on the record.

13     The time is 4:20 p.m.

14          Counsel, you may begin.

15          MS. LO:  Q.  Mr. Kensinger, at the time of

16     this incident, you had a good look at the weapon

17     that the officer hit you with; is that correct?

18     A.   Yes.

19     Q.   And, in fact, during the criminal trial you

20  were able to draw a picture of, I think you called it, a

21  "billy club," that the officer hit you with, correct?

22     A.   Yes.

23          MS. LO:  Okay.  I'm going to show you a

24     picture which I'm going to mark as Exhibit 8 to

25     your deposition.

                                                    235

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page47 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1   Officer Craft, and Officer Goodwin; is that correct?

2       A.    Yes.

3       Q.    Were there other officers that you would have

4   sued but didn't know who they were?

5       A.    I don't know what I can sue over.

6       Q.    Okay.  Did you explore bringing a lawsuit

7   against who we've been calling the SUV officer?

8       A.    Yes.  I would have liked to.

9       Q.    Okay.  But you were not able to identify who

10  that officer was?

11      A.    Yes.  And, ultimately, he never did anything

12  to me.

13      Q.    Okay.  How about the officer that kicked you?

14      A.    I could not identify that officer.

15      Q.    Okay.  Do you know if anyone from the Eureka

16  Police Department was involved in this incident?

17      A.    There was Eureka Police on the scene.

18      Q.    How do you know that?

19      A.    I don't know that.

20      Q.    Well, then, why did you tell me that it was

21  Eureka Police officers on the scene?

22      A.    Because we went to the Eureka jail, there was

23  many officers on the scene, and they were wearing

24  different types of uniforms.

25      Q.    Okay.  So there was more than one law

                                                        249

1    not resting it properly.

2        Q.    What does -- what does -- okay.  Your tendon

3    had separated from the bone?

4        A.    Yes.  And she described that as being

5    tendinitis.

6        Q.    Okay.  She said you were not resting it

7    properly?

8        A.    Correct.

9        Q.    What did you tell her you were doing and what

10   did she think that you ought to be doing?  Let's start

11   with what did you tell her that you were doing?

12       A.    I told her I was still doing landscape work

13   one-handed as best I could.

14       Q.    And she was critical of you for doing that?

15       A.    She said it won't get better that way.

16       Q.    Okay.  But you did indicate to her that you

17   were just using your right hand and not using your left

18   hand in your landscaping work, correct?

19       A.    I indicated to her that I couldn't help but

20   use my left hand.

21       Q.    Okay.

22       A.    Even when I didn't want to.

23       Q.    Okay.  And she said that you were not going to

24   get better that way.  Now, were you doing landscaping

25   work between December 9, 2009 and your visit on

                                                        254

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page49 of 76

Kensinger vs. CHP    Sean Kensinger                3/29/12

1    January 26, 2010?

2        A.    Yes.

3        Q.    Okay.  Was there a time when you took some

4    time off work?

5        A.    Yeah.  After this visit.

6        Q.    Okay.  So what days were you off work, what

7    were the dates?  It seems like the first day would have

8    been January 26, 2010 when your doctor told you to stop

9    reinjuring your elbow or stop using your left arm.

10       A.    Yes.

11       Q.    And then when did you return to work?

12       A.    When the prescription for the steroid patches

13   ran out, and I think that was three months long.

14       Q.    Okay.  So you took about three months off from

15   doing landscaping?

16       A.    Yes.

17       Q.    At that time, did she take any x-rays?

18       A.    No.

19       Q.    Did she prescribe any physical therapy?

20       A.    Yes.

21       Q.    And what physical therapy did she prescribe?

22       A.    She gave me a -- she enrolled me in a physical

23   therapy class.

24       Q.    Did you take those classes?

25       A.    I showed up once and just took the

                                                    255

Case3:11-cv-00885-WHA  Document27  Filed05/03/12  Page50 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1          A.   I was constantly working on the hill getting

2   about 3 to $5,000 a month with Bobcat work.

3          Q.   Okay.  Do you have any documents that show

4   that you were receiving 3 to $5,000 a month?

5          A.   Just my bank statements.

6          Q.   Okay.  I'm going to show you the bank

7   statements that were produced during discovery, and I

8   don't know if I'm going to mark this as an exhibit yet,

9   but I'll show them to you.

10          Do you recognize these documents?

11          A.   Yes.

12          Q.   Okay.  You've seen them before?

13          Now, from these documents, can I calculate how

14   you came to $10,000?

15          A.   You could see that my deposits stopped and my

16   withdrawals grew.

17          Q.   Is that all?

18          A.   That's pretty much it.

19          Q.   Now, your -- you pay both personal and

20   business expenses out of this Heritage Bank of Commerce

21   Checking Account No. 001315837; is that correct?

22          A.   Yes.

23          Q.   Okay.  So when the account is depleted, we

24   don't know whether it's being used for personal expenses

25   or whether it's being used for business expenses; is

                                                        261

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page51 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1     that correct?

2          A.    Correct.

3          Q.    In fact, you paid for your criminal lawyer out

4     this of account for the DUI trial; is that correct?

5          A.    Yes.

6          Q.    And you're also paying for your attorneys in

7     this case out of this account, correct?

8          A.    This account has been closed.

9          Q.    Okay.  This account has been closed?

10         A.    Yes.

11         Q.    When was it closed?

12         A.    Last month.

13         Q.    Okay.  Is there a reason why you closed it?

14         A.    Because I moved out of Fremont area.  I don't

15    longer do business in Fremont.

16         Q.    Okay.  So have you changed the business

17    address of Aiden Landscape Design?

18         A.    Yes.

19         Q.    So it's now out of your -- sorry, I don't

20    remember the name of --

21         A.    The Wrightwood home.

22         Q.    The Wrightwood home.  Okay.

23              So you calculate your loss of $10,000 based on

24    the amount that your bank account with Heritage Bank of

25    Commerce was depleted during the three months after

                                                          262

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page52 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1          MS. LO: Okay. "Plaintiff hired day laborers
2     on a cash basis when necessity warranted." But
3     what I'm focusing on is the damages period, and it
4     states in lines 14 to 16 that you did all the work
5     during the damages period.
6          THE WITNESS: It says "virtually."
7          MS. LO: Okay.
8     Q.   So "virtually" is J.C.?
9     A.   Yes.
10    Q.   And day laborers?
11    A.   Yes.
12    Q.   How much is that?
13    A.   It's hard to calculate.
14    Q.   Can you calculate it? Did you pay them in
15    cash?
16    A.   Yes.
17    Q.   Would it be reflected in any of your bank
18    accounts?
19    A.   Yes.
20    Q.   Where?
21    A.   In the withdrawals.
22    Q.   There are withdrawals that correlate exactly
23    to what you paid the day laborers?
24    A.   No.
25    Q.   Okay. How about what you paid J.C., did you

                                                    266

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page53 of 76

Kensinger vs. CHP     Sean Kensinger                    3/29/12

1   pay him in cash?

2        A.   Yes.

3        Q.   Okay.  And, again, would you be able to track

4   down in your bank account the exact amounts that you

5   paid to J.C.?

6        A.   No.

7        Q.   Okay.  Now, was Dr. Heinrich the doctor who

8   told you that you could not work, or you should not

9   work, between January 26, 2010 and three months after

10  that?

11       A.   She told me that I should not work the first

12  time.  I didn't take her advice to heart.

13       Q.   Okay.

14       A.   The second time I went in in January, I took

15  her advice.

16       Q.   Did Dr. Scerback ever tell you that you

17  couldn't do landscaping work anymore?

18       A.   He told me that I would have tendinitis for

19  the rest of my life.

20       Q.   Okay.  Did he tell you that the tendinitis was

21  caused by the -- by you being hit with the baton?

22       A.   Yes.

23       Q.   Okay.  Dr. Scerback said exactly that, that it

24  was caused -- that your tendinitis was caused by being

25  hit with a baton?

                                                    267

Case3:11-cv-00885-WHA Document27 Filed05/03/12 Page54 of 76

Kensinger vs. CHP     Sean Kensinger     3/29/12

1     be able to tell the jury?

2     A.    She also took pictures of my arm.

3     Q.    Okay.  Have you asked to look at those photos?

4     A.    Yes.

5     Q.    And are they available?

6     A.    No.  She's misplaced them.

7     Q.    When did she take photos of your arm?

8     A.    In December.

9     Q.    December -- after December 12th?

10    A.    It could have been before.  I went to her

11   house.

12    Q.    When did you go to her house in December?

13    A.    I don't know exactly but.

14    Q.    Was it before your first visit to Kaiser

15   Fremont?

16    A.    No.

17    Q.    Was it before your second visit to Kaiser

18   Fremont?

19    A.    Yes.  I was doing work at her house.  She was

20   one of the landscape jobs I was doing.

21    Q.    What kind of work were you doing at her house?

22    A.    Paver stone, retaining walls, decks.

23    Q.    Paver stones?

24    A.    Yes.

25    Q.    Retaining walls?

269

Kensinger vs. CHP       Sean Kensinger                3/29/12

1          A.    Deck.

2          Q.    Deck.

3                And were you the only person working on that

4     project?

5          A.    I hired some day laborers for help and J.C.

6     helped me once.

7          Q.    Can you tell me what was the actual physical

8     labor that you did at your sister's house?

9                And this was in December 2010, correct?

10         A.    December all the way through the summer of

11    2010, I stayed with her whenever I had a DUI class,

12    which I was taking in San Francisco, and when I stayed

13    with her I would do work at her house.

14         Q.    Now, were you taking the DUI class because of

15    the incident that occurred in this case?

16         A.    I was taking the DUI class because of what

17    Officer Craft told the DMV people at the DMV hearing.

18         Q.    Okay.  So it was related to this incident?

19    There's no other DUI that we haven't discussed?

20         A.    Correct.

21         Q.    Okay.  So tell me what was the actual physical

22    work that you did at your sister's house between

23    December 20 -- December 2009 and summer 2010.

24         A.    Irrigation.  I put in a sprinkler system.

25         Q.    Okay.  What does that involve?  Were you

                                                          270

Case3:11-cv-00885-WHA  Document27  Filed05/03/12  Page56 of 76

Kensinger vs. CHP    Sean Kensinger                    3/29/12

1    digging holes --

2         A.    Yes.

3         Q.    -- that's what I want to know.

4         A.    I was digging.

5         Q.    Were you lifting paving stones?

6         A.    Yeah.

7         Q.    What else were you doing?

8         A.    Lifting retaining wall stones.  Those are

9    about 80 pounds a piece.

10        Q.    Mm-hmm.  Anything else?

11        A.    Rototilling, removing dirt.

12        Q.    Mm-hmm.

13        A.    Adding stone and dirt and sand, and placing

14   paver stone, cutting paver stones with a diamond blade.

15        Q.    Did you have any other landscaping business

16   other than working at your sister's house between

17   December 2009 and summer 2010?

18        A.    I did.  I can't recall them.

19        Q.    Okay.  But were you primarily working on her

20   house?

21        A.    Yes.

22        Q.    Can you estimate of your landscaping work

23   during that period what percentage was your sister's

24   house?

25        A.    About 95 percent.

                                                    271

Kensinger vs. CHP      Sean Kensinger                    3/29/12

1              I, DONIELLE J. DEL CARLO, CSR No. 10476, a

2    Certified Shorthand Reporter, do hereby certify:

3              That SEAN KENSINGER, the witness in the

4    foregoing deposition, was duly sworn to testify the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7              That said deposition was reported by me at

8    the time and place therein stated and was thereafter

9    transcribed as herein after set forth;

10             That, if signed, the deposition was read by

11   or to said witness, corrected in every particular

12   desired way, and was subscribed by said witness;

13             That, if unsigned, the deposition was

14   retained by me at the office of DE SOUZA & ASSOCIATES

15   and was available for reading, correcting and signing by

16   said witness.

17             I further certify that I am not interested

18   in the outcome of said action, nor connected with, nor

19   related to any of the parties in said action or to their

20   respective counsel.

21             IN WITNESS WHEREOF I have hereunto set by

22   hand this _16th_ day of _April_ , 2012.

23             _[signature]_

24                            CERTIFIED SHORTHAND REPORTER

25

                                                         283

De Souza & Associates      650-341-2671      desouzacr@att.net

# EXHIBIT E

1                SUPERIOR COURT OF CALIFORNIA

2                   COUNTY OF HUMBOLDT

3           HONORABLE MARILYN B. MILES, JUDGE

4              NO(S). **CR1002750C**

5                     o0o

6

7  PEOPLE OF THE STATE OF CALIFORNIA,

8                Plaintiff,

9      vs.

10  **SEAN PATRICK KENSINGER,**

11               Defendant,

12  _____/

13             R E P O R T E R ' S

14           T R A N S C R I P T

15                 O F

16          P R O C E E D I N G S

17              *   *   *

18          **FRIDAY, MARCH 18, 2011**

19              *   *   *

20

21           A P P E A R A N C E S

22

23  For the People:          For the Defendant:

24  Paul V. Gallegos        **MARK C. BRUCE**
     District Attorney       Attorney at Law
25  825 Fifth Street        3135 Boeing, Ste. 7A
     Eureka, California  95501   McKinleyville, California
26                      95519
     By:  **ELAN FIRPO**
27  Deputy District Attorney

28  LORI A. ROCK, CSR# 12040

i

1                              **WITNESS INDEX**

2

3   **WITNESSES**                            **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**

4   GOODWIN, Officer Jeffrey *(Cont.d)*                  111        157         170
                                                                    181
5
    SHARP, Carol Jean                          183       197        205         208
6
                                        *     *     *
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1                Friday, March 18, 2011 -- 8:56 a.m.
 2                              oOo
 3                 (The following took place within the
 4                 presence and hearing of the jury.)
 5          THE COURT:  People of the State of California versus
 6     Sean Patrick Kensinger, Case Number CR1002750C.
 7          Good morning, ladies and gentlemen, and thank you for
 8     your patience.  There was some civil matters that had to be
 9     attended to.
10          We'll ask counsel to state your appearances for the
11     record, then, please.
12          MS. FIRPO:  Elan Firpo for the People.
13          MR. BRUCE:  Mark Bruce on behalf of Mr. Kensinger.  He
14     is present this morning.
15          THE COURT:  Okay.  All members of the jury and
16     alternates are present.
17          We had left off with the cross-examination of Officer
18     Goodwin.
19          THE WITNESS:  Yes, ma'am.
20          THE COURT:  You are still under oath.
21          THE WITNESS:  Yes.
22                          *   *   *
23                 GOODWIN, Officer Jeffrey,
24                 resumed the witness stand and
25                 testified further under oath:
26
27          THE COURT:  Mr. Bruce, then, we'll continue.
28          MR. BRUCE:  Thank you, your Honor.
```

—Lori A. Rock, CSR# 12040 —

```
 1              THE WITNESS:  Yes.
 2              THE CLERK:  Please state your full name for the record
 3    and spell your last name.
 4              THE WITNESS:  Carol Jean Sharp, S-H-A-R-P.
 5                        DIRECT EXAMINATION
 6    BY MS. FIRPO:
 7         Q.   Good morning, Ms. Sharp.  Thank you so much for your
 8    patience.
 9              Ms. Sharp, are you familiar with any of the people in
10    this case?  Do you know Mr. Collins or Mr. Kensinger or
11    Mr. Gardner?
12         A.   No.
13         Q.   And did you know any of the law enforcement officers?
14         A.   No.
15         Q.   Okay.
16              So, you have no relationship to anybody in this case.
17              Is that true?
18         A.   No.
19         Q.   Do you recall the events of December 5th, 2009?
20         A.   Yes.
21         Q.   At about approximately 5:10 in the evening that day --
22         A.   It was dark.
23         Q.   Okay.
24         A.   And early evening.  I'm not sure of the time.
25         Q.   Okay.
26              And were you driving that day?
27         A.   Yes.
28         Q.   Where were you driving?
```

1    A.   From McKinleyville back to Eureka.

2    Q.   Okay.

3         While you were on US 101, did something catch your

4    attention?

5    A.   Yes, a pickup.

6    Q.   And what specifically caught your attention about the

7    pickup?

8    A.   The pickup was swerving in and out of its lane.

9    Q.   Okay.

10        Were you following behind the pickup?

11   A.   Yes, behind.

12   Q.   And how far did you follow behind the pickup?  When did

13   you first notice it?

14   A.   I first noticed it just past Giuntoli Lane and I

15   continued to follow, watching.  You know, once or twice you

16   might do that but it continued, so I called 9-1-1.

17   Q.   Okay.

18        So, let's talk about the swerving a little bit.  Was it

19   swerving within the lane?  Did they stay within the lines?

20   A.   No.  Didn't run off the road, but it would swerve over

21   out of the line and then drift over to the other lane and

22   swerve and drift back kind of.

23   Q.   Okay.

24        So, there's a piece of paper right there *(pointing)* and

25   some pens on the side.  Maybe could you draw the lanes of the

26   freeway and then use another color and draw how far outside the

27   lanes the vehicle was going?

28   A.   Okay.  *(Witness complies.)*

1           Wasn't far out of the lane, but it was definitely, so.

2      Q.   So, going not off the road but onto the shoulder past

3   the solid white line.

4           Is that true?

5      A.   Yes.

6      Q.   And then going into the lane next to it.

7           Is that what you are indicating there?

8      A.   He would change lanes.  It wasn't just off and then

9   over (indicating) but he would go off and then he changed a

10  lane and then he go off that side.

11     Q.   Okay.

12          How long have you been driving, Ms. Sharp?

13     A.   Wow.  Fifty years.

14     Q.   Okay.

15          Have you noticed this type of driving before very

16  often?

17     A.   No.  It was the first time.

18     Q.   Okay.

19          MS. FIRPO:  At this time, I'd like to mark this as

20  People's Exhibit No. 7, if I may approach?

21          THE COURT:  Is that next in order?

22          MS. FIRPO:  It is.

23          (People's Exhibit No. 7, a Diagram, was marked

24            for identification.)

25  BY MS. FIRPO:

26     Q.   So, you stated a moment ago you decided to call 9-1-1.

27     A.   Yes.

28     Q.   Why did you decide to call 9-1-1?

—Lori A. Rock, CSR# 12040—

1    A.   Because I figured he was -- or the person -- I didn't

2    see the person -- was impaired as they were driving somehow.

3    Q.   Okay.

4         And did you have a safety concern, then?

5    A.   Yes.

6    Q.   And when you called 9-1-1, do you recall what you told

7    them?

8    A.   Probably said there's a drunk driver on the road.  And

9    she asked me where and by that time, we were close to the

10   highway patrol office.  And she asked if I had the license

11   plate and I told her no, I wasn't close enough, and did it

12   continue and it continued.

13   Q.   Were you able to describe the vehicle other than a

14   pickup?

15   A.   Yeah, just a dark pickup.

16   Q.   Okay.

17        Do you recall describing it as a Titan pickup?

18        MR. BRUCE:  Objection.  Leading.

19        THE COURT:  That will be sustained.

20   BY MS. FIRPO:

21   Q.   Would it refresh your recollection to look at the

22   police report and see what you told the police?

23   A.   Yes.

24   Q.   So, the way this works, I'll show this to you and you

25   read it to yourself and if it refreshes your recollection and

26   you agree with it, then let us know.

27   A.   *(Witness refers to report.)*

28        Okay.  Yes.

—Lori A. Rock, CSR# 12040—

1    Q.   Thank you.

2         Do you recall describing the truck as a Titan?

3    A.   Yes.  I saw the name on the back of the truck.

4    Q.   It was December 2009.  It is a while ago.

5    A.   Yes, it is.

6    Q.   How far did you follow the pickup?

7         You stated you saw it at Giuntoli Lane.  How far did

8    you follow it?

9    A.   All the way into Eureka.  And it turned -- it was in

10   the right lane and at that time, I thought, well, maybe I

11   should take a look at this person.  So, I pulled up on the left

12   side and looked at the person and it was a guy.  And then he

13   turned off, so I went another block and turned and found where

14   they had stopped.

15   Q.   When you saw the person just before they turned, were

16   you able to get a look at him at all?

17   A.   Yes.

18   Q.   And what did you see?

19   A.   He had dark hair.  Just regular looking, nothing

20   unusual.

21   Q.   So, could you see the color of his skin, the length of

22   his hair?

23   A.   Oh, white.  Short, regular hair.

24   Q.   And age approximately?

25   A.   Twenties, you know.  Mid/late 20.  Young man.

26   Q.   Okay.

27        So, you stated you turned right at the next

28   intersection and caught up with them.

1    A.   Yes.

2    Q.   Okay.

3         I have something we were looking at yesterday that the

4    police officer drew and it's marked as People's Exhibit 4.   I'd

5    like to show you this real quickly.   Ms. Sharp, this is what

6    the officer drew as the intersection where the Titan truck was

7    stopped?

8    A.   Yes.

9    Q.   And if you'll see on the right-hand side about halfway

10   up the paper, it says witness?

11   A.   Uh-huh.

12   Q.   That was meant to indicate your car?

13   A.   Yeah.   I might have been a little closer to the

14   intersection but that general area.

15   Q.   Okay.

16        So, when you found -- when you found the vehicle, when

17   you found the truck, was the officer already on site?

18   A.   I first noticed the three guys were out of the truck

19   and then an officer walked up.

20   Q.   Okay.

21        So, did you decide to pull over and stop?

22   A.   Yes.

23   Q.   Why did you decide to do that?

24   A.   My reason for following them was in case they wanted to

25   change drivers.   And then I stopped just to see what was going

26   on and then something was said and I decided to stay there and

27   watch in case there was any unnecessary roughness by the

28   police.

1  leave us alone. Come on, Man. What are you doing this for,

2  and repeat those kinds of things.

3      Q.   Okay.

4           So, those were the two on the ground.

5           Did you see a man standing up?

6      A.   Yes, there was.

7      Q.   And did you hear him say anything?

8      A.   Not that I know of.

9      Q.   Okay.

10     A.   Yeah, I don't remember.

11     Q.   Did you hear him at all yelling?

12     A.   Not specifically.

13     Q.   Okay.

14          So -- and I want to be clear, when you pulled up on the

15  scene, the officer was already out of the car and the

16  individuals were already laying on the sidewalk.

17          Is that what you are saying?

18     A.   No.  They were getting out of the pickup.

19     Q.   Let's get back to the beginning and get all of this

20  clear.

21          You pull up on the scene and they were out of the

22  pickup?

23     A.   Uh-huh.

24     Q.   And the officer was there?

25     A.   Yes.  He was walking towards them.

26     Q.   Why don't you tell me then what happened?

27     A.   He told them to get down.  Two of them did.  One

28  continued to walk on the sidewalk.

1   seen them driving and what had happened at the scene.

2       Q.   Okay.

3           So, you gave the officer a statement starting when you

4   saw the driving?

5       A.   Yes.

6       Q.   Did you talk to the officer about what you saw when

7   they were at the intersection?

8       A.   Yes.

9       Q.   Okay.

10          Ms. Sharp, at any point did you see any of the officers

11  strike any of the individuals?  Other than the taser and the

12  taking down, did you see any force used?

13      A.   No.  And I was kind of watching for it because I

14  thought if they're going to do something, then that needed to

15  be reported, as well.

16      Q.   Okay.

17          So, that was your particular interest --

18      A.   Uh-huh.

19      Q.   -- to watch for excessive force, that's true?

20      A.   Yeah.

21      Q.   Did you see if the officers had batons, those sticks

22  that they are issued?

23      A.   I don't recall the baton.

24      Q.   If you were specifically looking for force, do you

25  think you would have noticed one if one was used?

26          MR. BRUCE:  Objection.  Speculation.

27          THE COURT:  That will be sustained as asked.  You don't

28  have to answer that.

1 SUPERIOR COURT OF CALIFORNIA

2 COUNTY OF HUMBOLDT

3 HONORABLE MARILYN B. MILES, JUDGE

4 NO(S). **CR1002750C**

5 oOo

6

7 PEOPLE OF THE STATE OF CALIFORNIA,

8  Plaintiff,

9  vs.

10 **SEAN PATRICK KENSINGER,**

11  Defendant,

12 ————————————————————————/

13 R E P O R T E R ' S

14 T R A N S C R I P T

15 O F

16 P R O C E E D I N G S

17 * * *

18 **WEDNESDAY, MARCH 23, 2011**

19 * * *

20

21 A P P E A R A N C E S

22

23 For the People:  For the Defendant:

24 Paul Gallegos  **MARK C. BRUCE**
  District Attorney  Attorney at Law

25 825 Fifth Street  3135 Boeing, Ste. 7A
  Eureka, California  95501 McKinleyville, California

26    95519

27 By:  **ELAN FIRPO**
  Deputy District Attorney

28 LORI A. ROCK, CSR# 12040

i

1                          **WITNESS INDEX**

2

3  **WITNESSES**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOODWIN, Officer Jeffrey | 346 | 375 | 381 | |
| BELSCHNER, Kay | 383 | 397 | 399 | |
| CRAFT, Officer Paul | 400 | 413 | | |
| SHARP, Carol Jean | 417 | 423 | 425 | |

9                       *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1                      *   *   *
2                  SHARP, Carol Jean,
3             resumed the witness stand and
4             testified further under oath:
5
6         THE COURT:  If could you state your name, again, for
7    the record, please.
8         THE WITNESS:  Carol Jean Sharp, S-H-A-R-P.
9         THE COURT:  Ms. Sharp, I do remind you you are still
10   under oath.  You had not been excused.  You are still under
11   oath.
12        THE WITNESS:  Yes.
13        THE COURT:  Ms. Firpo, then.
14                  DIRECT EXAMINATION
15   BY MS. FIRPO:
16     Q.  Thank you, Ms. Sharp, for coming back.  I just really
17   have a couple questions for you.
18         The first one is about observing Mr. Kensinger's
19   driving.  He's testified for us that he was merely tired, he
20   was sleepy and that halfway through the safety corridor, he
21   realized he was swerving and he stopped.
22         Is that what you observed?
23     A.  Stop swerving?
24     Q.  Stopped swerving.
25     A.  He did better when he was driving slower.
26     Q.  But did the swerving stop?
27     A.  I didn't -- I wasn't as close behind him.  I held back.
28   It appeared to me that nobody passed me.  Everybody stayed
```

—Lori A. Rock, CSR# 12040 —

```
 1   water, please?
 2       Q.   Sure.
 3            So, I'll ask you just -- and, again, some of this is
 4   old ground.   Why did you stay and watch?
 5       A.   I stayed and watched because I heard one of the men on
 6   the ground say don't kick me or why did you kick me, something
 7   about kicking.   And the officer said, "I didn't kick you."   And
 8   as far as I could tell, I did not see him kick him.   He was
 9   walking towards him.   He continued to walk.   Then I thought --
10   well, this may be.   I'll just stay and watch in case the cops
11   are rougher than they should be.
12       Q.   Okay.
13            And so you stayed and watched for that purpose?
14       A.   Yes.
15       Q.   And were the cops rougher than they should be, in your
16   personal opinion?
17            MR. BRUCE:   I'm going to object.   That -- I'll withdraw
18   my objection.
19            THE WITNESS:   I don't think so, no.   I was pleased with
20   the officers and how they handled it because these were loud-
21   mouthed, cursing, belligerent, young men who weren't
22   cooperating.   They weren't fighting with them, but they weren't
23   cooperating.
24            MS. FIRPO:   Okay.   Thank you.   That's all I have.
25            THE COURT:   Mr. Bruce, then.
26            MR. BRUCE:   Thank you, your Honor.
27
28   ///
```

—Lori A. Rock, CSR# 12040—

1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF HUMBOLDT  )

3

4

5

6                    CERTIFICATE OF REPORTER

7

8        I, LORI A. ROCK, a Certified Shorthand Reporter of the

9   State of California, do hereby certify that the foregoing

10  pages, numbered 1 to 212 and 343 to 427, inclusive, are a true

11  and correct transcription of my shorthand notes taken on the

12  17th, 18th, 22nd and 23rd days of MARCH, 2011, in the matter

13  entitled PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, versus

14  **SEAN PATRICK KENSINGER**, Defendant, No. **CR1002750C**, in the

15  criminal files of the Superior Court of California, County of

16  Humboldt.

17

18

19                Dated this 12TH day of OCTOBER, 2011.

20

21        _____

22        LORI A. ROCK
          Certified Shorthand Reporter #12040

23

24

25

26

27

28

─────────Lori A. Rock, CSR# 12040 ─────────

## DECLARATION OF PERSONAL SERVICE

Case Name:   **Sean Kensinger v. CHP et.al.**

No.:   **C 11-00885**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On May 3, 2012, I served the attached

**1.      NOTICE OF MOTIONS AND MOTIONS BY DEFENDANT JEFFREY GOODWIN FOR SUMMARY JUDGMENT AND BY DEFENDANTS PAUL CRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**2.      MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS BY DEFENDANTJEFFREY GOODWIN FOR SUMMARY JUDGMENT AND BY DEFENDANTS PAULCRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**3.      DECLARATION OF AMY LO IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**4.      DECLARATION OF JEFFREY GOODWIN IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**5.      DECLARATION OF EMILY KERAM IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**6.      DECLARATION OF PAUL CRAFT IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**7.      DECLARATION OF JARED ZWICKEY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**8.      [PROPOSED] ORDER GRANTING MOTIONS BY DEFENDANT JEFFREY GOODWIN FOR SUMMARY JUDGMENTAND BY DEFENDANTS PAUL CRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES GOODWIN**

May 3, 2012
Page two
Sean Kensinger v. CHP et.al.
MSJ

by personally delivering a true copy thereof to the following person(s) at the address(es) as follows:

**James Y. Higa**
**HIGA & GIPSON, LLP**
**71 Stevenson St., 4th fl.**
**San Francisco, CA  94105**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 3, 2012, at San Francisco, California.

| | |
|---|---|
| Anh Ho | /s/ Anh Ho |
| Declarant | Signature |

OK2011900202
20599998