1  KAMALA D. HARRIS
   Attorney General of California
2  JOHN P. DEVINE
   Supervising Deputy Attorney General
3  AMY W. LO
   Deputy Attorney General
4  State Bar No. 194308
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA 94102-7004
     Telephone: (415) 703-5524
6  Fax: (415) 703-1234
     E-mail: Amy.Lo@doj.ca.gov
7  *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SEAN KENSINGER,** | C 11-00885 |
| Plaintiff, | **DECLARATION OF EMILY KERAM IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES** |
| v. | |
| **CALIFORNIA HIGHWAY PATROL, et al.,** | |
| Defendants. | Date:    June 7, 2012<br>Time:    2:00 p.m.<br>Courtroom: 8 (19th Floor)<br>Judge: Honorable William Alsup |
| | Trial Date: June 25, 2012 |

I, EMILY KERAM, declare that I make this declaration based upon my personal

knowledge, I am competent to testify to all matters stated herein, and if called and sworn as a

witness in this matter, I would testify as follows:

1.    I have been retained as an expert in psychiatry and mental health by defendants

Paul Craft and Jeffrey Goodwin in the above-entitled case. A copy of my curriculum vitae is

attached as Exhibit A. On March 2, 2012, I examined plaintiff Sean Kensinger by stipulation of

counsel pursuant to Rule 35 of the Federal Rules of Civil Procedure. I prepared a written expert

1

1    report with my opinions and bases therefore, and provided the report to defense counsel. I am

2    informed and believe that my written report was timely disclosed and provided to plaintiff's

3    counsel in this case. A copy of my expert report is attached hereto as Exhibit B.

4         2.    During my examination of plaintiff, I asked him to identify the aspects of the

5    incident at issue in this litigation that caused him the most emotional distress. Mr. Kensinger

6    responded that what distressed him most about the incident was his belief that the police officers

7    treated him with disrespect and are lying. Mr. Kensinger stated, "That bothers me more than

8    actually getting beaten. It's 100% of my distress. Emotionally I'm over being hit. The pain is

9    about zero now." Although Mr. Kensinger received treatment from Kaiser Permanente on

10   multiple occasions since the incident on December 5, 2009, he never received any treatment for

11   his emotional distress.

12        3.    In my professional opinion, Mr. Kensinger's anxiety and depression developed in

13   response to his anger at what he perceives to be the dishonesty and disrespect of the officers who

14   arrested him. Mr. Kensinger is absolutely clear that it is this aspect of his arrest that causes him

15   distress. He does not feel emotional distress as a result of being struck during his arrest or from

16   the subsequent bruising he sustained. The bruising and pain Mr. Kensinger sustained during the

17   incident of December 5, 2009 did not cause his diagnosis of an adjustment disorder with anxiety

18   and depressed mood. Mr. Kensinger reported that his symptoms of this diagnosis are caused by

19   the dishonesty and disrespect of the officers who arrested him.

20        I declare under penalty of perjury under the laws of the State of California that the

21   foregoing is true and correct and that this declaration was executed this 3rd day of May, 2012, in

22   Santa Rosa, California.

23

24

25   EMILY A. KERAM, M.D.

26

27

28

2

# EXHIBIT A

## CURRICULUM VITAE

Prepared: 3/25/11

| | |
|---|---|
| **Name:** | Emily A. Keram, M.D. |
| **Academic Title:** | Assistant Clinical Professor of Psychiatry<br>Psychiatry and the Law Program<br>University of California San Francisco |
| **Practice Address:** | 1160 N. Dutton Avenue, Suite 255<br>Santa Rosa, CA 95401 |
| **Phone:** | (707) 525-0800 |
| **Fax:** | (707) 526-8886 |

## EDUCATION:

| Dates | Institution Attended & Location | Degree or Status | Major Subjects |
|---|---|---|---|
| 1978-1981 | Duke University, Durham, NC | 1981, B.S.,<br>magna cum laude | Zoology |
| 1984-1988 | University of North Carolina<br>Chapel Hill, School of Medicine | 1988, M.D. | Medicine |
| 1988-1992 | University of North Carolina Hospitals,<br>Chapel Hill, North Carolina | Intern & Resident | Psychiatry |
| 1991-1992 | U.S. Department of Justice,<br>FCI-Butner, Butner, North Carolina | Fellowship | Forensic<br>Psychiatry |

## LICENSES, CERTIFCATIONS:

| | |
|---|---|
| 1990 | Medical License, North Carolina 39185 (inactive) |
| 1991 | Medical License, California A49929 (active) |
| 1994 | Diplomate, American Board of Psychiatry & Neurology (field: psychiatry) |
| 1998 | Diplomate, American Board of Psychiatry & Neurology, sub-specialty certification in Forensic Psychiatry (re-certified 2008) |

## EMPLOYMENT:

| | |
|---|---|
| 1992-1996 | Director, Consultation-Liaison Psychiatry<br>Sonoma County Community Hospital, Santa Rosa, California |
| 1992-1996<br>2003-present | Clinical Psychiatry Private Practice<br>Santa Rosa, California |
| 1992-2000<br>2003-present | Forensic Psychiatry Private Practice<br>Santa Rosa, California |
| 1996-2000 | Clinical Chief<br>Santa Rosa VA Mental Health Clinic<br>Santa Rosa, California |
| 2000-present | Assistant Clinical Professor of Psychiatry<br>Psychiatry and the Law Program<br>University of California, San Francisco |

Emily A. Keram, M.D.
Page 2

| 2004-present | Staff Physician |
| | Santa Rosa VA Mental Health Clinic |
| | Santa Rosa, California |

## CORRECTIONAL EXPERIENCE:

| 1990-1992 | North Carolina Correctional Center for Women | Staff Psychiatrist to General Population and Death Row |
| 1991 | North Carolina Department of Corrections | Staff Psychiatrist to General Population in Juvenile Facility |

## MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS:

| 1985-2002 | American Medical Association |
| 1986-present | American Psychiatric Association |
| 1986-1992 | North Carolina Psychiatric Society |
| 1991-present | American Academy of Psychiatry and the Law |
| 1991-2003 | American Psychosomatic Society |
| 1992-1997 | Sonoma County Medical Association |
| 1992-1997 | California Medical Association |
| 1992-present | Northern California Psychiatric Society |

## PROFESSIONAL ORGANIZATION ACTIVITIES:

| 1992-1995 | Sonoma County Medical Association | Physician Well-Being Committee |
| 1992-1995 | Sonoma County Medical Association | Women in Medicine Committee |
| 1993-1995 | Sonoma County Medical Association | Mentor, High School Students Planning to Pursue Medicine |
| 1995-1997 | Sonoma County Medical Association | Professional Standards and Conduct Committee |
| 1993-1999 | American Academy of Psychiatry and the Law | Private Practice Committee |
| 1994-1998 | American Academy of Psychiatry and the Law | Founder and Chair, Early Career Development Committee |
| 1996-1999 | American Academy of Psychiatry and the Law | Councilor |
| 1997-present | American Academy of Psychiatry and the Law | Program Committee |
| 1998-2001 | American Academy of Psychiatry and the Law | Chair of Membership Committee |
| 2000-present | California Psychiatric Association | Judicial Action Committee |
| 2000-present | American Academy of Psychiatry and the Law | Law Enforcement Liaison Committee |
| 2000-2002 | American Academy of Psychiatry and the Law | Secretary |
| 2001 | American Academy of Psychiatry and the Law | Chair of Annual Meeting Program Committee |
| 1998-2008 | American Academy of Psychiatry and the Law | Membership Committee |
| 2005-2009 | American Academy of Psychiatry and the Law | Chair, Law Enforcement Liaison Committee |
| 2008-present | American Academy of Psychiatry and the Law | Education Committee |
| 2009-present | American Psychiatric Association | Isaac Ray Award Committee |

## OTHER PROFESSIONAL ACTIVITIES, AWARDS, AND PROFESSIONAL COMPETENCE:

Executive Council of American Academy of Psychiatry and the Law: 1996-1999, 2000-2002
Practice Guidelines for Insanity Defense Evaluations Task Force, American Academy of Psychiatry and the Law: 1999-2002

Emily A. Keram, M.D.
Page 3

Presidential Appointee to Committee for Recertification in Forensic Psychiatry, American Board of
        Psychiatry and Neurology: 2000-2002
Member, California Commission on Peace Officers Standards and Training Committee on the Mentally Ill
        and Developmentally Disabled: 2001-2002
Senior Reviewer, Mental Health Policies, Procedures, Contacts and Use of Force, United States
        Department of Justice Federal Consent Decree with Los Angeles Police Department: 2001-2002
Invited Participant, Violence in the Workplace Symposium, National Center for the Analysis of Violent
        Crime, Federal Bureau of Investigation, June 2002
Rossiter Award for Outstanding Achievement in Forensic Mental Health, Forensic Mental Health
        Association of California, 2004
Heroes in the Fight Nominee, National Alliance on Mental Illness Sonoma County/Eli Lily and Company,
        2008
Gold Resolution Recipient, Sonoma County Board of Supervisors, Awarded to the Sonoma County Crisis
        Intervention Training Team: 2010
Subject Matter Expert, "Officer Involved Shootings: A five year study." San Francisco Police Department.
        January 20, 2010. See: http://sfolice.org/Modules/ShowDocument.aspx?documentid=24139
        Accessed July 2, 2010
Commendation Recipient, City of San Francisco Mental Health Board, Awarded to the San Francisco
        Police Department Crisis Intervention Training Team

**PRESENTATIONS AT SCIENTIFIC AND PROFESSIONAL MEETINGS:**

**NATIONAL:**

American Psychiatric Association Annual Meetings:
1995, 1996, 1998            Course on Forensic Psychiatry, "Overview of the Judicial System"

American Academy of Psychiatry and the Law Annual Meetings:
1998            Course on Private Practice, "Forensic Psychiatry Report Writing"
1998            Panel Chair and Organizer, "Forensic Psychiatry Unchained: Practicing
                Outside the Box". Presented "Consultation to Law Enforcement Agencies:
                Focus on the FBI's EAP Program"
1999            Panel Chair and Organizer, "Suicide by Cop"
1999            Panel Chair and Organizer, "Playing Doctor: The Physician Impostor"
2000            Panel Chair and Organizer, "Suicide by Cop: Incident Management in Canada and the
                U.S."
2000            Panel Presenter, "Draft AAPL Practice Guidelines for NGRI Evaluations-Presentation of
                the Task Force"
2001            Panel Chair and Organizer, "Mental Health Training for Law Enforcement"
2001            Panel Presenter, "Law Enforcement Liaison: Models of Cooperation"
2002            Panel Presenter, "Consultation to Law Enforcement: Ethical Concerns"
2003            Research in Progress, "Evaluating Suspected Cases of Suicide by Cop"
2004            Debate Participant, "Resolved: Psychiatrists Should Not Assist with Police
                Interrogations"
2005            Panel Chair and Organizer, "Honor Bound at Guantanamo Bay"
2008            Panel Chair and Presenter, "Hamdan in Guantanamo: The First Military Commissions
                Trial"
                Panel Presenter, "Assessing Confession Evidence: Police Coercion or Valid Admissions
                of Guilt?"
2010            Presenter, "The Twelve Steps of Forensic Psychiatry," Presentation to Early Career
                Committee

**REGIONAL:**

1993            Sonoma County Academy of Family Physicians
                "The Real Fifteen-Minute Hour: When Fifteen Minutes Feels Like Sixty"

Emily A. Keram, M.D.
Page 4

| | |
|---|---|
| 1994 | Sonoma County Medical Association, Senior Physicians Committee "Insanity Defense Evaluations" |
| 1994 | California Academy of Family Physicians Annual Meeting Workshop: "Antidepressant Update" |
| 1998 | Northern California Psychiatric Society Course, "Forensic Psychiatry Practice Opportunities for the Clinician" |
| 2001 | Forensic Mental Health Association of California "Suicide by Cop" |
| 2001 | Risk Management and City Attorney's Offices City of Santa Rosa, California "Workplace Violence Risk Assessment and Management" |
| 2002 | Forensic Mental Health Association of California "Mental Illness on Trial: Insanity Defense Evaluations in the Post-Hinckley Era" |
| 2003 | Stepping In Conference (Law Enforcement and Mental Health Professionals "The History of the Insanity Defense" |
| 2004 | Forensic Mental Health Association of California "The Death Penalty and the Mentally Ill" |
| 2004 | San Francisco Society of Consultation-Liaison Psychiatrists, "Forensic Aspects of Consultation-Liaison Psychiatry" |
| 2008 | Sonoma County Department of Mental Health, "Law Enforcement Contacts with Mentally Ill Citizens" |
| | UCSF Department of Psychiatry, "Psychiatric Testimony in *US v. Hamdan*" |
| 2010 | Sonoma County Department of Mental Health, "Mental Health Issues in Returning Iraq and Afghanistan Veterans" |
| | Santa Rosa VA Community Based Outpatient Clinic, "*US v Hamdan:* The First Military Commissions Trail at Guantanamo Bay |
| 2011 | Santa Rosa Kaiser Permanente Department of Psychiatry, "Mental Health Issues in Returning Iraq and Afghanistan Veterans" |

## PRESENTATIONS TO LAW ENFORCEMENT:

| | |
|---|---|
| 1999 | Paper, "Suicide by Cop: Issues in Outcome and Analysis" Suicide and Law Enforcement Conference Behavioral Science Unit, FBI Academy, Quantico, Virginia |
| 2000 | "Suicide by Cop: An Overview" Behavioral Sciences Unit San Francisco Police Department |
| 2000 | "Suicide by Cop: Decedent Profiles and Typology" Crisis Negotiation Team Oakland Police Department |
| 2001-2010 | "Major Mental Disorders, Cognitive Disorders and Personality Disorders" "Suicide by Cop" Crisis Intervention Training (quarterly training) San Francisco Police Department |
| 2002 | "Suicide by Cop" Crisis Intervention Training San Jose Police Department |
| 2004 | "Post-traumatic Stress Disorder" Peer Counselor Training San Rafael Police Department |
| 2007, 2009 | "Major Mental Disorders, Cognitive Disorders and Personality Disorders" "Suicide by Cop" Crisis Intervention Training Marin County Law Enforcement Agencies |

Emily A. Keram, M.D.
Page 5

| | |
|---|---|
| 2007 | "Suicide by Cop" |
| | Sonoma County Law Enforcement Agencies and Sonoma County Department of Mental Health |
| | "Suicide by Cop," "Major Mental Disorders," "Personality Disorders" |
| | Block training |
| | Sonoma County Sheriff's Department |
| | |
| 2007-2008 | "Suicide by Cop," "Police Suicide," "Mental Illness" |
| | Crisis Intervention Training (semi-annual training) |
| | San Jose Police Department |
| 2008-present | "Suicide by Cop," "Major Mental Disorders," "Personality Disorders" |
| | Rohnert Park Department of Public Safety |
| | "Overview of Mental Illness, Major Mental Disorders, Personality Disorders," "Suicide by Cop" |
| | Sonoma County Crisis Intervention Training |
| | "Major Mental Disorders, Cognitive Disorders, Personality Disorders," "Suicide by Cop" |
| | Modoc County Crisis Intervention Training |
| | "Overview of Mental Illness and Major Mental Disorders," "Suicide by Cop" |
| | Petaluma Police Department |
| 2008-present | "Overview of Mental Illness, Schizophrenia, Mood Disorders," "Returning Iraq/Afghanistan Veterans," "Suicide by Cop" |
| | Yolo County Crisis Intervention Training |
| 2009 | "Major Mental Disorders, Cognitive Disorders and Personality Disorders" "Suicide by Cop" |
| | Richmond Police Department |
| 2010 | "Law Enforcement Response to OEF/OIF Veterans in Crisis" |
| | Sonoma County Sheriff's Office Hostage Negotiations Team |

**OTHER PRESENTATIONS**

| | |
|---|---|
| 2010 | "Sonoma County Veterans Justice Services" |
| | Sonoma County Probation Department |

**CONTINUING MEDICAL EDUCATION COURSES ATTENDED:**

| | |
|---|---|
| 1992-present | Attended sufficient continuing education courses to maintain licensure. |

**PUBLIC SERVICE:**

| | |
|---|---|
| 1990-1991 | Volunteer, "Physicians On-Call", WTVD (television), Raleigh, NC |
| 1994-1995 | Guest, "The Allen Stock Show", KSRO (radio), Santa Rosa, CA. Topics: Holiday Blues, Recovered Memory and False Memory Syndrome, National Depression Screening Day, Women in Medicine |
| 1994-1995 | Guest, Local Evening News, KFTY (television), Santa Rosa, CA. Topics: National Depression Screening Day, False Memory Syndrome Litigation |
| 1994, 1995 | Organizer, National Depression Screening Day, Sonoma County, CA |
| 1996 | Lecturer, "Women and Depression", Women's Health Fair, sponsored by Health Plan of the Redwoods, Santa Rosa, CA |
| 2002-present | Volunteer Clinician, West Coast Post-trauma Retreat, San Rafael, CA |
| 2009-present | Founder and Chair, Sonoma County Veteran's Justice Services Steering Committee |
| 2010-present | Member, Posttraumatic Stress Disorder Task Force, Assistance Dog Institute, Bergin University |

**SERVICE TO PROFESSIONAL PUBLICATIONS:**

| | | |
|---|---|---|
| 1995-1999 | Bulletin of the American Academy of Psychiatry and the Law | Reviewer |

Emily A. Keram, M.D.
Page 6

| 1999-present | Journal of the American Academy of Psychiatry and the Law | Reviewer |
| 2001-2007 | Journal of the American Academy of Psychiatry and the Law | Editorial Board |

## ADMINISTRATIVE EXPERIENCE:

| 1993-1994 | Chair, Utilization Review Committee, CPC Redwoods Hospital, Santa Rosa, CA Responsible for overseeing utilization review protocols for inpatient psychiatric hospital. |
| 1993-1995 | Chief Financial Officer, Pacific Health Associates, AMC, a multi-disciplinary mental health group practice. Responsible for securing financing, accounting, payroll, and financial and tax reports. |
| 1995-1996 | President, Pacific Health Associates, AMC. Responsible for developing and implementing marketing strategy, contract negotiations, oversight of other officers. |
| 1996-2000 | Clinical Chief, Santa Rosa VA Mental Health Clinic. Administrative and clinical responsibility for delivery of services by psychiatrists, psychologists, nurses, social workers, and primary care residents. Oversee 1450 active cases. Developed and implemented individual and group programs in PTSD, Substance Abuse, Affective Disorders, Psychotic Disorders, Pain Management and Medical-Psychiatric Liaison. Conduct quality improvement reviews. Prepare and administer Mental Health portion of overall clinic budget of $272,500. |
| 2000-2004 | UCSF Psychiatry and the Law Program. Primary responsibility for developing and implementing criminal portion of curriculum and annual Criminal Mock Trial. Assist in civil and administrative curriculum development and implementation, recruitment and interview of fellowship applicants. Primary responsibility for development of Federal and State Court referral sources of criminal evaluations for faculty and forensic fellows. Primary responsibility for developing, implementing and maintaining billing and receivables accounting system and tracking system for fellows' cases. Assist in developing, implementing and maintaining records for maintenance of ACGME accreditation of program. |
| 2010 | Founder and Chair, Sonoma County Veterans Justice Services Steering Committee. Primary responsibility for coordinating a multi-disciplinary team including judges, district attorneys, public defenders, probation officers, law enforcement, and county veterans service officers in indentifying and managing justice-involved veterans in Sonoma County with the goal of the veteran increasing treatment benefit, decreasing criminal recidivism, and accessing available resources. |

## TEACHING:

| Academic Year | Course | Nature of Contribution | Class Size |
|---|---|---|---|
| 1992-2000 | Supervision of Family Practice Residents on Behavioral Science Rotation, UCSF-affiliated Family Practice Residency, Sutter Hospital, Santa Rosa, CA | Supervision and teaching of assessment, psychopharmacology, psychiatric consultation-liaison, management of the high-utilizing patient. | 1-2 |
| 1992-2000 | Third year medical students, Family Practice rotation | Psychopharmacology, Personality Styles in Medical Practice | 2-6 |
| 1993-2003 | Family Practice Board Review Course, UCSF Department of Family and Community Medicine | Psychiatry Section | 200-300 |
| 1998 | PTSD Team Weekly Seminar San Francisco VAMC | Sexual Dysfunction in PTSD | 15 |
| 1999 | PTSD Team Weekly Seminar San Francisco VAMC | Insanity Defense Evaluations | 15 |

Emily A. Keram, M.D.
Page 7

| 2000 | Grand Rounds<br>Department of Psychiatry<br>UCSF | Suicide by Cop | 50 |
| 2000 | Criminal Law Class<br>University of California<br>Hastings School of the Law | Insanity Defense Evaluations | 50 |
| 2000-present | Didactic Seminar<br>Psychiatry and the Law Program<br>UCSF | Teach selected topics related to<br>civil, criminal and consultative<br>forensic psychiatry | 5 |
| 2000-2004 | Landmark Case Seminar<br>Psychiatry and the Law Program<br>UCSF | Teach criminal case curriculum | 5 |
| 2000-2004 | Forensic Case Conference<br>Psychiatry and the Law Program<br>UCSF | Case consultation to faculty and<br>forensic fellows | 5 |
| 2000-present | Tutorial on Civil and Criminal<br>Cases<br>Psychiatry and the Law Program<br>UCSF | Supervision of forensic fellows | 2 |
| 2000-2004 | Forensic Research Seminar<br>Psychiatry and the Law Program<br>UCSF | Consultation regarding program<br>research | 9 |
| 2002 | Grand Rounds<br>Department of Psychiatry | Playing Doctor: Physician<br>Imposters | 50 |
| 2002 | Mental Health Law Course<br>University of California<br>Boalt Hall School of Law | Treatment Issues | 30 |

## UNDERGRADUATE AND MEDICAL SCHOOL RESEARCH:

| 1979-1981 | Member, Duke University Goat Watching Society<br>Sensory Dependent Development of Maternal/Neonate Attachment |
| 1980-1981 | Work/Study Student, Duke University Department of Biochemistry<br>Assisted Frederick Schachat, Ph.D. with nematode physiology studies |
| 1982-1984 | Laboratory Technician, University of North Carolina, Chapel Hill<br>Department of Neuropharmacology, Laboratory of Richard Mailman, Ph.D.<br>Characterized aspects of dopamine receptor binding using<br>radioreceptor assays |
| 1984 | Summer Research Intern, University of Vienna, Vienna, Austria<br>Allegemeines Krankenhaus, Laboratory of Oleh Hornykiewicz, Ph.D.<br>Radioligand tagging of benzodiazepines |
| 1985 | Summer Research Intern, University of Groningen, Groningen, The Netherlands<br>Department of Neuropharmacology, Laboratory of Hans Rollema, Ph.D.<br>Characterized aspects of catechol-o-methyl transferase |

## POSTGRADUATE RESEARCH:

| 1992 | Evaluation of Competency in the Deaf Defendant |
| 1993-1995 | Project Director, Medical Cost Offset Project, Health Plan of the Redwoods |
| 1999-present | Law Enforcement-related research in Suicide by Cop and mental health curriculum<br>development |

## ONLINE EXPERIENCE:

| 1994-1995 | Host, ShrinkRapWomen's Wire |

Emily A. Keram, M.D.
Page 8



1994-1996    Guest, Mystery Writer's Forum, America Online
1995-1996    Co-founder, Healix, Women's Wellness Community

## ORIGINAL ARTICLES:

Mailman, RB, DeHaven, DL, Halpern (Keram), EA, Lewis, MH.  Serum Effects Confound the Neuroleptic Radioreceptor Assay.  Life Sci Mar 12; (11) 1057-1064, 1984

Pisetsky, II, Keram, EA, Drossman, DA.  Building a Psychiatric-Medical Liaison: Observations of the Process.  Psychiatr Med 10:  149-163, 1992

Keram, EA.  Physicians and Gender.  Sonoma County Physician 44;5:20, 1993

Keram, EA.  Medical Cost Offset Program at HPR.  Sonoma County Physician 45;5:25, 1994

Keram, EA.  Preparing for the Forensic Psychiatry Board Examination:  How to Create an Effective Study Plan.  AAPL Newsletter 23(2): 8-9, 1998

Keram, EA, Ferrell, BJ.  Suicide by Cop: Issues in Outcome and Analysis.  Suicide and Law Enforcement, FBI Behavioral Science Unit, 2002

Giorgi-Guarnieri D, Janofsky J, Keram EA, Lawsky S, Meredith P, Mossman D, Schwartz-Watts D, Scott C, Thompson J, Zonana H, AAPL Practice Guideline for Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense. J Am Acad Psychiatry Law 30 (2 Supp): S1-40, 2002

Keram EA, The Insanity Defense and Game Theory: Reflections of Texas v. Yates. J Am Acad Psychiatry Law 30(4):470-473, 2002

Keram EA, Commentary: A multidisciplinary approach to developing mental health training for law enforcement. J Am Acad Psychiatry Law 33(1):47-9, 2005

Keram EA, Will medical ethics be a casualty of the war on terror? J Am Acad Psychiatry Law. 2006;34(1):6-8

Keram, EA, Commentary: the zone-of-danger, physical impact and PTSD. J Am Acad Psychiatry Law. 2006:34(2):200-3

Keram, EA, PTSD in Iraq and Afghanistan War Veterans.  Sonoma Medicine.  2006;57(3)

# EXHIBIT B

EMILY A. KERAM, MD
1160 N. DUTTON AVENUE, SUITE 255
SANTA ROSA, CA 95401
TEL: 707.525.0800  FAX: 707.526.8868

April 6, 2012

Amy Lo
Office of the Attorney General
State of California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004

*Re:*    ***Kensinger v California Highway Patrol, et al.***
         **United States District Court, Northern District of California**
         **Case No. C 11-00885**

Dear Ms. Lo:

At your request, I interviewed Sean Kensinger, a 36-year-old divorced Caucasian male
for three hours at your office on March 2, 2012. I also reviewed collateral information
provided to me relevant to the above-referenced matter. The following report contains
my opinions and their bases. I reserve the right to modify or change my opinions should
additional material become available in the future.

**Qualifications**

My qualification to provide expert testimony in the field of psychiatry is based on my
training, education, clinical experience, research, and prior testimony in civil and/or
criminal courts in the States of California and Arizona; U.S. District Courts in California,
Washington, North Carolina and the District of Columbia; as well as in the tribunal of the
Military Commissions at the U.S. Naval Station Guantanamo Bay, Cuba.

Relevant to the current case, I have practiced clinical psychiatry for twenty-four years. I
have expertise in treating patients with substance abuse, adjustment, mood, and anxiety
disorders. For the past ten years I have provided law enforcement training on field
contacts with emotionally disturbed subjects. I have qualified as an expert in the areas of
substance abuse, adjustment, mood, and anxiety disorders. I have also qualified as an
expert in law enforcement contacts with emotionally disturbed subjects.

**Reason for Referral**

This matter was referred to me for evaluation and opinion of the following:
   1.  Mr. Kensinger's psychiatric diagnosis and its causation;

2. The effects of narcotics consumption, including but not limited to alcohol and/or marijuana, on a person including but not limited to a person's ability to perceive and recollect.

## Collateral Information

Collateral information was obtained from your office. Although I have reviewed all material provided, I have summarized only those portions that were most relevant to the formulation to my opinions.

### Prior law enforcement and Superior Court records

1. Alameda County Superior Court, People v Sean Kensinger, 156057 B. Convicted 1/16/1996, one count PC 242 M, battery. Fined $1000 (restitution). Three years probation.
2. Alameda County Superior Court, People v Sean Kensinger, 3175380, filed approximately 4/3/1998. Charge unknown. Case dismissed. File purged.
3. Freemont Police Department, Report No 010211008, 2/11/2001. Arrest for resisting (bowling alley fight).
4. Alameda County Superior Court, People v Sean Kensinger, 192513. Convicted 7/19/2002 for PC 148(A) M, resisting. One day jail time, $100 fine, and three years probation. File purged.
5. Mendocino County Superior Court records related to CHP citation on 7/14/2007 for speeding.
6. Mendocino County Superior Court related to CHP citation on 1/22/2008 for speeding.
7. Mountain View Police Department, Case No 08006350, 9/16/2008, Assault with Deadly Weapon (bar fight.)
8. Santa Clara County Superior Court, complaint filed 9/18/2008 related to 9/1/2008 arrest. Judgment 3 days. #BB836224

### Humboldt County Superior Court records

1. Humboldt County Superior Court Register of Actions
   a. Mr. Kensinger was charged with Driving Under the Influence on 12/5/2009. Alleged blood alcohol was 0.22 (limit 0.08)
2. Trial transcript of Officer Craft's testimony
3. Trial transcript of Officer Goodwin's testimony
4. Trial transcript of Officer Sharp's testimony
5. Trial transcript of Kay Belschner's testimony
6. Trial transcript of Justin Collins' testimony
7. Trial transcript of Sarah Dodier's testimony
8. Trial transcript of Sean Kensinger's testimony

*Re: Kensinger v CHP, et al.*

**Medical records**

1. CA Forensic Medical Group
   a. Mr. Kensinger was evaluated subsequent to his arrest on 12/5/2009. Physical exam was significant for slight swelling on the upper left arm (full range of motion intact). He was treated with an ice pack. He evidenced signs of alcohol intoxication.
2. Kaiser Fremont Main Campus Vol I-II
   a. 10/1988 Mr. Kensinger suffered a right middle finger injury playing football. X-ray was normal. [KAI 99, 142-43]
   b. 3/1989 Mr. Kensinger suffered a left arm and shoulder injury. X-ray was normal. [KAI 98]
   c. 11/1989 Mr. Kensinger suffered a left wrist injury playing football. X-ray was generally normal. [KAI 97, 138]
   d. 12/1990 Mr. Kensinger was treated for muscle strain after jumping into a swimming pool for the roof of his house. [KAI 163-64]
   e. 4/1994 Mr. Kensinger suffered a left ankle sprain in a football game. He was treated with Motrin. [KAI 173]
   f. 10/1995 Mr. Kensinger fractured his right 5th finger in a football game. He was treated with a splint for several weeks. [KAI 181-82]
   g. 4/1996 Mr. Kensinger suffered a left ankle injury. X-ray was normal. [KAI 96]
   h. 4/1997 Mr. Kensinger received stitches in his right brow after an injury during a basketball game. [KAI 188-92]
   i. 11/1997 Mr. Kensinger suffered lacerations to his head, elbow, and head. Weapon is illegible. Police were noted to be on scene. Mandatory health practitioner report of injury caused by deadly weapon, criminal or spousal abuse filed with Fremont Police Department. Mr. Kensinger was treated with seven staples to the scalp and four staples to the left arm. [KAI 58, 201-03]
   j. 7/1998 Mr. Kensinger suffered face and neck burns as a result of an accident involving a charcoal fire. Skin peeling noted. Hair was charred. He was treated with Silvadene cream. [KAI 206-08]
   k. 1/2001 Mr. Kensinger was seen for depression secondary to his girlfriend breaking up with him. Mr. Kensinger reported increased alcohol and drug use and a past history of gang involvement. He was seen for one session with a psychologist. [KAI 219-20]
   l. 8/2003 Mr. Kensinger was seen for lower back pain. [KAI 235]
   m. 5/2004 Mr. Kensinger was seen for left shoulder pain secondary to falling from his bicycle after drinking 2-3 beers. He was found to have fractured his left acromioclavicular (AC) joint. [KAI 246-59]
   n. 11/2004 Mr. Kensinger underwent open reduction internal fixation (ORIF) surgery of his left AC joint after sustaining a fall from his bicycle in 5/2004. Hardware was surgically removed in 3/2006. He was treated with pain medication (Vicodin) and physical therapy. [KAI 34-54]

3

*Re: Kensinger v CHP, et al.*

    o.  9/2006 Mr. Kensinger presented to the Emergency Department with a 3-inch long laceration of his right leg. He stated a truck door had fallen onto his leg. Pain score 6/10. He was sutured and prescribed pain medication. [KAI 268-76]

    p.  2/2008 Mr. Kensinger was seen for sharp, moderate left sided rib pain secondary to a snowboarding fall ten days previous. He was prescribed pain medication. [KAI 506-07]

    q.  12/2009. Mr. Kensinger was seen on 12/9/2009 for injuries secondary to the index event. He was diagnosed with ecchymosis and contusion (bruising) of his upper arm and chest. Also reported pain and bruising in knees. Pain reported as 7-8/10. He was recommended to use ice, limit activity, use gentle stretching and was prescribed pain medication. The physician told Mr. Kensinger she expected his injures would heal with time and without sequelae but would take several weeks before he could do his job without limitations due to pain from his injuries. [KAI 534-38]

    r.  Mr. Kensinger was subsequently seen on 1/26/2010 for ongoing pain related to the 12/2009 injury. Pain severity was 4-5/10. He was diagnosed with medial epicondylitis and prescribed pain medication. Previous recommendations were also continued. [KAI 540-44]

    s.  3/2010 Mr. Kensinger was seen after a physical fight with a friend. His suffered an extensive fracture of his nose. Mandatory violent injury report made to Fremont Police Department. He was treated with pain medication and discharged home. [KAI 546-56] He subsequently underwent closed nasal reduction of the fracture. Discharge instructions included avoiding heavy lifting for two or more weeks after surgery. [KAI 581-601]

    t.  5/2010 Mr. Kensinger was seen after a motor vehicle accident. He reported ongoing pain and limitation of activity secondary to 12/2009 injury. Nose was healing well. He was diagnosed with neck pain and prescribed pain medication. Left elbow x-ray was normal. [KAI 636-38]

    u.  7/2010 Mr. Kensinger was seen for low back pain secondary to heavy lifting. He was prescribed rest, heat, and pain medication. Home back care program discussed. [KAI 639-40]

    v.  1/2011 Mr. Kensinger was seen for neck pain and chronic low back pain. He was prescribed pain medication. [KAI 644-46]

**Filings related to above-referenced matter**

1. Complaint
2. Plaintiff's initial disclosures 1 & 2
3. Officer Craft's interrogatories to plaintiff
4. Officer Goodwin's interrogatories to plaintiff
5. Plaintiff's response to Officer Craft's interrogatories
6. Plaintiff's response to Officer Goodwin's interrogatories
7. Plaintiff's designation of expert issues
8. Defendant's designation of expert issues

*Re: Kensinger v CHP, et al.*

**Deposition**

1. Rough draft of Sean Kensinger deposition, March 29, 2012 with exhibits 7-10

**Additional records**

1. State Farm Insurance Company
2. Video of Mr. Kensinger in the sally port after his arrest on 12/5/2009

**Summary of collateral information**

Mr. Kensinger has a long history of contacts with law enforcement. In addition to his arrest on 12/5/2009, Mr. Kensinger was arrested for alcohol-related incidents in which he was involved in physical fights and during which he resisted law enforcement officers.

Mr. Kensinger's medical record is significant for a history of multiple painful injuries throughout his adolescence and adulthood. These included sports injuries, physical fights, a motor vehicle accident, and the bruising he sustained during the 12/5/09 incident. He also suffers chronic low back pain, which is presumed to be caused by his landscaping work. He was frequently prescribed pain medication. Limited activity was recommended at various times for pain related to his 2004 bicycle accident, landscaping work, the 12/5/09 incident, his broken nose, and the 2010 motor vehicle accident.

The medical record is also significant for a lack of any report of mental health symptoms or treatment related to the 12/5/2009 incident. There is also no report of mental health symptoms or treatment related to any of the numerous painful injuries Mr. Kensinger suffered during his adolescence and adulthood. Mr. Kensinger appears to have had one mental health contact, in 2001, related to the ending of a romantic relationship.

Mr. Kensinger's records indicate that law enforcement contacts and need for medical attention often occurred in the context of his alcohol use. These include falling off his bicycle while intoxicated in 2004, fighting while intoxicated in 2008, and driving while intoxicated in 2009. The 2004 bicycle injury resulted in the fracture of his AC joint, and required two subsequent surgeries.

**Non-confidentiality apprisal**

At the outset of the evaluation, I notified Mr. Kensinger that I am a forensic psychiatrist whom you consulted for evaluation of the issues above. I informed Mr. Kensinger that I would prepare a report summarizing the results of my evaluation and that any information that he might provide to me could be included in that report. I explained that I would send the report to you and that his attorney would receive a copy. I told him that I might be called to testify during any future proceedings in the current matter. I informed Mr. Kensinger that he did not have to answer any question he didn't want to. Mr. Kensinger indicated that he understood these issues. I have included relevant portions of this evaluation in my opinions.

5

*Re: Kensinger v CHP, et al.*

## Summary of interview of Mr. Kensinger on March 2, 2012

### Psychiatric history

Mr. Kensinger denied a significant past psychiatric history. He recalls having seen a therapist once or twice in high school, most likely at his parents urging as he was frequently truant. [As noted above, he was seen at Kaiser in 2001 for depression after the ending of a romantic relationship.]

### Substance use history

Mr. Kensinger began using alcohol at the age of 17 or 18. At the time of the interview he drank two or three beers about twice a month. He reported similar alcohol use at the time of his 12/2009 arrest. In the past he consumed more alcohol.

Mr. Kensinger first used marijuana at age 16. At the time of the interview he reported using marijuana once or month or less. He uses about a gram at a time, smoking a water pipe. He's had a medical marijuana card for eight years for pain management. He denied a history of methamphetamine or cocaine use. He used Ecstasy and mushrooms on a few occasions. His last use was three years ago. Mr. Kensinger has used LSD on five or six occasions. His last use was a few years ago.

Mr. Kensinger stated that no one had ever expressed concern about his drug or alcohol use to him. He did note that his ex-wife did not like the fact that he bought expensive beer.

### Legal history

In addition to the law enforcement contacts listed above, Mr. Kensinger reported two admissions to juvenile detention for fighting; a 1993 arrest for rioting in Ashland, Oregon (Mr. Kensinger was struck in the back with a broomstick during the altercation); and a 2002 arrest for shoplifting in Santa Cruz for which he was placed on probation. Mr. Kensinger stated he had drunk about a pitcher of beer prior to his arrest in February 2001.

### Mr. Kensinger's description of the December 5, 2009 incident

Mr. Kensinger drank a glass of water, a beer and a "Duck Fart" before leaving the Arcata Airport at approximately 5 pm. As he drove toward Eureka he became sleepy and noticed the car was swerving. He exited at the first Eureka exit. His friend, JC, was asleep in the back. His friend in the passenger seat, Geronimo, had no driver's license. He opened his truck door and Geronimo came over to the passenger side. They talked through the window, deciding what to do.

6

A couple of seconds later Officer Craft parked approximately four car lengths behind them. The officer turned on a red light, a flashlight, and another light. He got behind his vehicle's door and told them, "Don't move, stay where you are." They just "sat in his lights."

Geronimo told Mr. Kensinger they got pulled over because he was swerving while he was driving. Another officer pulled up in front of his truck on a diagonal, less than a car length away. Officer Craft told Mr. Kensinger to come to him. They met halfway. Officer Craft shined the light in Mr. Kensinger's face and said in a loud, angry tone, "You almost ran a lady over back there." The officer asked, "What have you been drinking?" Mr. Kensinger responded, "Nothing." The officer said, "You're a fucking liar," and pointed the light to the curb, indicated that Mr. Kensinger should sit down. Geronimo was already sitting on curb. JC was being asked to get out of the car.

Mr. Kensinger sat on the curb. An officer started yelling at JC, "Get out of there, don't move, show me your hands." A spotlight was adjusted to shine where they were sitting. Officer Craft told another officer to get the Taser. Geronimo had told an officer, "You need to calm down."

An officer opened the truck door and told JC to lie down. JC complied. Officer Craft said, "Driver come here." He directed Mr. Kensinger to hood of his patrol car with his light. He told Mr. Kensinger to turn around and put his hands behind his back. Officer Craft struck Mr. Kensinger twice on his left arm while he was turning around. Mr. Kensinger dropped to his knees and ducked while Craft tried to hit him again with his "billy club." Mr. Kensinger sustained three blows in total.

Another officer was screaming orders at Geronimo. Mr. Kensinger reported that the officer had his finger on the trigger of the Taser as he was yelling. The officer fired the Taser at Geronimo and Mr. Kensinger put his head down. He could hear JC scream, "Why did you Tase him? Ow ow, why did you kick me?" Then an officer kicked JC in the side and handcuffed him.

Mr. Kensinger continued, "I was on the ground for maybe five minutes. I didn't look up again. I had a pebble in my mouth. Another cop came up, picked me up by the handcuffs. As he's picking me up I said, 'Ow ow ow my arm!'" The officer then put Mr. Kensinger in the back of a patrol car next to JC.

The officer started asking Mr. Kensinger questions. Mr. Kensinger reported that he started asking the officer questions. "I said, 'Why did you hit me?' 'Where did you take Geronimo?' I started yelling out the door. 'Hey, you guys are going to pay for this. You can't do this. I have a lawyer. I'm going to sue you.' Then Officer Goodwin came to the door and opened it. I asked him, 'You here to save

*Re: Kensinger v CHP, et al.*

me from these maniac cops?' And Goodwin said, 'Come with me." He put me in his car in the back seat and left the door open.

Mr. Kensinger reported, "Officer Goodwin said, 'You were resisting.' I said, 'That's bullshit. Were you guys on steroids?' Goodwin asked me about alcohol, he said he could smell it on me. I told him I had a beer and a duck fart."

Mr. Kensinger reported that Officer Goodwin told him that he had consumed more alcohol than that. So Mr. Kensinger stopped asking questions and started asking for his lawyer. Mr. Kensinger was then taken to jail.

Mr. Kensinger stated that he had three ounces of marijuana in his truck when he was arrested. He believes that "obviously" the nice cop searched his car and left it there because the other officers beat him up. When asked why he had so much marijuana in his car, Mr. Kensinger stated he preferred not to answer that question. He then stated, "I smoked a lot."

Mr. Kensinger stated that he asked for ice at the jail as his arm had begun to hurt. No one brought any. An older officer examined Mr. Kensinger. Officer Goodwin had him blow into a Breathalyzer. Mr. Kensinger is certain that he saw the results, which were 0.00. Goodwin had him blow in the Breathalyzer again. Mr. Kensinger was given ice after about an hour.

Mr. Kensinger was taken out of the holding cell and brought to an area with plastic chairs and a TV. He and JC watched TV until they were released.

When asked if he feels at all responsible for what happened on 12/5/2009, Mr. Kensinger responded, "No, not at all. I was doing the right thing. I pulled myself over."

Mr. Kensinger is certain that he remembers the 12/5/11 incident correctly. "I remember it. It's so clear in my mind. I believe I was so amped once they started hitting Geronimo, I just burned through the alcohol."

**Mr. Kensinger's description of his physical injury resulting from the   12/5/2009 incident and its effect on his functioning**
1. "Massive swelling, I couldn't move my arm up and down for a week."
2. Mr. Kensinger described "bruising up and down my whole arm. The elbow hurt the worst."
3. The pain was a 10/10 for a week. He couldn't sleep. The pain decreased to a 9 after one week. And then 8, 7, 6 for the next three months. "I was living at a 2-3/10 when I went to the doctor and then took those three months off."
4. "I couldn't move my arm. I had to do the Bobcat and weed whacking with one hand."
5. After a month the swelling went down, but the range of motion didn't come back at that point. The doctor told him to rest his arm more. She prescribed

*Re: Kensinger v CHP, et al.*

more drugs and a steroid patch. The doctor told him the tendon was ripped off the bone and that he would have problems for the rest of his life. He then took three months off and did everything the doctors said to do, including physical therapy.

6. It took three months for the pain to go away. The pain went away after the x-rays came back and the other doctor told Mr. Kensinger that it would not bother him for the rest of his life.

7. Mr. Kensinger described the current physical effects of the injury he sustained on 12/5/2009. His arm is occasionally stiff when he wakes up or if he sleeps on it. He can work out the stiffness by his second cup of coffee. His range of motion is back to normal.

**Mr. Kensinger's description of his emotional injuries resulting from the 12/5/2009 incident and their effect on his functioning**

1. "First off, I lost my best friend, Geronimo. He wasn't doing anything. They Tased him twice. He's sitting in jail. They let us out." Mr. Kensinger bailed him out with $2000.00. Geronimo told him he shouldn't have done that, saying, "It doesn't matter. You can never get ahead." Geronimo started doing drugs with Mr. Kensinger's neighbors. He took Mr. Kensinger's oxycontin, crushed them and snorted them. Geronimo said, "I'm a drug addict, who cares, life sucks." Geronimo might have been using drugs before that, but he was so brutalized by the police he started doing drugs. Geronimo's wife said he had a meth problem in all this. Mr. Kensinger forgave Geronimo. But then when he got his credit card bill he saw that Geronimo was buying "booze" and getting $50 back. Mr. Kensinger told Geronimo that he couldn't come to his house anymore. Later in Hayward Mr. Kensinger told Geronimo he couldn't be in his life anymore because of drugs. Geronimo then beat him up and broke his nose. Mr. Kensinger no longer sees Geronimo.

2. "The cops are freaking liars. They lied during the trial. Who knows what they're doing to other people."

3. Mr. Kensinger is also upset by the financial cost of pursuing his criminal and civil cases. "It's cost me so much money to fight them." He spent $2000 on Geronimo's bail and $2000 for the DUI trial. "And that ended up with a hung jury so I plead to a wet and reckless."

4. Mr. Kensinger now feels fearful of the police. "I don't believe that I'll ever trust the cops again." Someone slit the screen in his house recently and he was scared to call the cops. But when he did, "She was as nice as she could be." Then she and another cop spent two hours out in front of his house. He went inside and locked the door because he was afraid of them.

5. Mr. Kensinger doesn't want to go to Eureka again. He sold his land in Humboldt. He had good friends up there and won't ever go back. "They took it all away from me. My house was almost done."

6. When asked if he could recall any other emotional injuries caused by the incident on 12/5/2009, Mr. Kensinger continued, "I can just tell you how it affects me. I got amped after reading transcript." By the next day he had no energy. "I just keep thinking of these lies they're saying. And then I'm over it.

9

*Re: Kensinger v CHP, et al.*

And then I get these interrogatories. And I realize how much I lost. And then I don't have any energy again. I'm just watching TV for a whole weekend. Then I'll feel good again on Monday and work on my interrogatories."

## Mr. Kensinger's description of his current psychiatric symptoms

Mr. Kensinger feels depressed almost every day. "I just don't want to talk to anyone. Like the girl I was dating. I just stopped talking to her." His neighbors say he's hibernating. Mr. Kensinger feels anxious when he's near a police officer unless there's six or seven of them. He avoids being around police officers. "I just don't feel like going outside sometimes, especially in my truck. They can pull you over anywhere."

Mr. Kensinger reported trouble falling asleep every night. He denied middle insomnia. His sleep pattern is irregular. He might sleep from 5 am to 7 am for several days straight and then sleep 24 hours straight.

Mr. Kensinger's appetite is unchanged. His weight is stable. He feels his concentration has improved since the 12/2009 incident. His denied problems with memory. His energy level is variable.

Mr. Kensinger endorsed experiencing suicidal ideation on two occasions. ""I just don't want to do anything anymore. It would just be easier to step out." This last occurred on President's Day weekend. Mr. Kensinger denied anhedonia. He still enjoys his work. He denied feeling guilty. He does have some low self-esteem related to the incident. "I was dating a girl. I told her about this case. She never called me again. They don't want the drama. Maybe they think it's a weakness that it's hard to talk about it." Mr. Kensinger endorsed episodic crying spells.

Mr. Kensinger occasionally feels hopeless. He does feel helpless. "It's all on me to take care of these cops, to get them off the street." Mr. Kensinger feels helpless in part because it was difficult to find an attorney to represent him. "No one would take this case because it's only worth $40,000 for soft tissue damages. I had to pay $13,000 to get someone to get someone to take the case."

When asked to identify what aspect of the 12/5/2009 incident has caused him the most psychiatric distress, Mr. Kensinger replied, "The lying and the bullshit, the complete lack of respect they have for a citizen, and their buddies lie. That bothers me more than actually getting beaten. It's 100% of my distress. Emotionally I'm over being hit. The pain is about zero now." The most important thing to Mr. Kensinger about this case is, "They shouldn't be police. They lied."

Mr. Kensinger stated that he felt better in August of 2011 when he moved to Wrightwood. "Work was good. I was getting the house fixed up. I was exercising and getting back in touch with my family down there." He felt worse in December because it was the anniversary of the incident.

10

*Re: Kensinger v CHP, et al.*

Mr. Kensinger denied receiving treatment for his emotional distress. He stated that he called Kaiser on President's Day weekend when he was feeling suicidal but "no one was there." He felt better by the following Tuesday and did not seek out treatment again.

## OPINIONS AND BASES

The following are my opinions in this matter to a reasonable degree of medical probability.

### Mr. Kensinger's psychiatric diagnoses

| | |
|---|---|
| Axis I | Alcohol abuse |
| | Adjustment disorder with mixed anxiety and depressed mood |
| Axis II | Narcissistic and antisocial personality traits |
| Axis III | See review of medical records |
| Axis IV | Psychosocial and environmental problems |
| | 1. Involvement with the legal system |
| Axis V | Global assessment of functioning = 70 |
| | (mild symptoms, generally functioning pretty well, has some meaningful interpersonal relationships) |

Alcohol abuse is a maladaptive pattern of alcohol use leading to clinically significant impairment or distress, as manifested by one (or more) of four diagnostic criteria occurring within a 12-month period. Mr. Kensinger's pattern of alcohol use caused clinically significant impairment as evidenced meeting the diagnostic criteria of recurrent substance use in situations in which it is physically hazardous (bicycle accident, DUI arrest); recurrent substance-related legal problems (see above); continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (fighting while intoxicated.)

The diagnosis of an adjustment disorder with mixed anxiety and depressed mood is made when emotional symptoms develop in response to an identifiable stressor occurring within three months of the onset of the stressor. The symptoms are clinically significant in that they cause either marked distress in excess of what would be expected from exposure to the stressor or significant impairment in functioning. Mr. Kensinger's anxiety and depression developed in response to his anger at what he perceives to be the dishonesty and disrespect of the officers who arrested him. Mr. Kensinger is absolutely clear that it is this aspect of his arrest that causes him distress. He does not feel emotional distress as a result of being struck during his arrest or from the subsequent bruising he sustained.

Mr. Kensinger evidences narcissistic and anti-social personality traits. Narcissistic traits include a feeling of being special and a sense of entitlement. These are evidenced in his interactions with law enforcement officers at the time of his arrest in the challenging statements he made to them. The same traits, and the same dynamics, are reflected in his

*Re: Kensinger v CHP, et al.*

pursuit of the current civil action.  Anti-social traits include failure to conform to social norms as evidenced by repeated arrests; irritability and aggressiveness as evidenced by repeated physical fights; reckless disregard for the safety of self and others as evidenced by bicycling and driving while intoxicated; and lack of remorse as indicated by rationalizing his behavior as correct at the time of his arrest, and failing to take responsibility for his actions.

**Cause of Mr. Kensinger's psychiatric diagnoses**

Alcohol abuse has a multi-faceted etiology.  None of these are related to the events of 12/5/2009.

As noted above, the bruising and pain Mr. Kensinger sustained during the incident of 12/5/2009 did not cause his diagnosis of an adjustment disorder with anxiety and depressed mood.  Mr. Kensinger reported that his symptoms of this diagnosis are caused by the dishonesty and disrespect of the officers who arrested him.

**The effects of narcotics consumption, including but not limited to alcohol and/or marijuana, on a person including but not limited to a person's ability to perceive and recollect.**

Alcohol impairs both perception and memory and thus may impair an individual's ability to perceive and recall an event that occurs when they are intoxicated. Detrimental effects may occur after consumption of one or two alcoholic beverages.

With respect to perception, alcohol alters awareness of time and somatic senses (particularly auditory and visual).  Misinterpretations are caused by direct effects and as a result of impairment in arousal.

Alcohol primarily disrupts memory by causing impairment in the transfer of information from short-term to long-term memory.  Non-distracted intoxicated subjects are typically able to recall information for up to one minute after it is presented.  Intoxicated subjects are able to recall information stored in long-term memory.  However, after consumption of one or two alcoholic beverages, intoxicated subjects typically begin to evidence impairment in their ability to recall events that occurred during intoxication once they are sober.

Thank you for referring this matter to me for evaluation and report.

Sincerely,

Emily A. Keram, M.D.

12

*Re:  Kensinger v CHP, et al.*

## Appendix A
### Deposition and Trial Testimony of Emily A. Keram M. D.

**Deposition testimony**
### 2007
*Boyd v. City and County of San Francisco, et al.*
U.S. District Court, Northern District of California, Case No. C04-5459
April 20, 2007

### 2008
*Zehra A.., et al,  v. Calvin Cat, State of California, et al.*
U.S. District Court, Northern District of California, Case No. CIV 445283
January 11, 2008

*Minnard v. Rotech Healthcare, Inc.*
U.S. District Court, Eastern District of California, Case No. 2:06-CV-01460-GEB-GGH
February, 15, 2008

### 2009
*Sandra J. Fee v. State of California, et. al.*
U.S. District Court, Northern District of California, Case No. 08-CV-01549-RMW
June 5, 2009

### 2010
*Jones v. County of Del Norte*
U.S. District Court, Northern District of CA, Case No. C08-3222 CW
February 26, 2010

### 2011
*Dempsey v CHP*
Sonoma County Superior Court
No. SCV 247776
August 12, 2011

*Cher v State of California, et al*
State of California Superior Court
County of Santa Clara, No. CIV-16517
December 29, 2011

**Trial testimony**
### 2007
*Boyd v. City and County of San Francisco, et al.*
U.S. District Court, Northern District of California, Case No. C04-5459
September 18 and 19, 2007

13

*Re: Kensinger v CHP, et al.*

> **2010**
> *Amin-Helton v. City of Tucson, et al.*
> Superior Court of the State of Arizona in and for the County of Pima
> No. C 2006 5129
> March 4, 2010
>
> *Sandra J. Fee v. State of California, et. al.*
> U.S. District Court, Northern District of California
> Case No. 08-CV-01549-RMW
> May 25 & 26, 2010
>
> **2011**
> *US v Rodriguez*
> U.S. District Court, Northern District of California
> Case No. CR-08-0083-PJH
> May 2, 2011
>
> **2012**
> *Cher v State of California, et al*
> State of California Superior Court
> County of Santa Clara, No. CIV-16517
> February 7, 2012

**Military Commissions testimony**
> **2008**
> *US v. Hamdan*
> Military Commissions
> July 16 & 17, August 6 & 7, 2008

**Habeas petition testimony**
> **2009**
> *Zuhair v. Obama*
> U.S. District Court, District of Columbia, Civ. No. 08-0864 (EGS)
> January 15 and February 20, 2009

**Daubert hearing**
> **2007**
> *Boyd v. City and County of San Francisco, et al.*
> U.S. District Court, Northern District of California, Case No. C04-5459
> July 12, 2007

**Other evidentiary hearing**
> **2010**
> *People v. Vargas*
> Superior Court of California, County of Mendocino, Case No. CRCR 07-76000
> February 5, 2010

*Re: Kensinger v CHP, et al.*

**Administrative hearing**
    **2011**
        Christopher Aguilar, MD, petitioner to the State of California Medical Board
        State of California, Office of Administrative Hearings
        June 27, 2011

**Involuntary medication for incompetent defendant hearing**
    **2008**
        *California v. Olian Byrd, Jr.*
        Superior Court of California, County of Sonoma, Case No. SCR-521106
        January 14, 2008

**Appendix B**
**Fees**

I charge $600.00 per hour for all activities related to civil forensic evaluations.

## DECLARATION OF PERSONAL SERVICE

Case Name:   **Sean Kensinger v. CHP et.al.**

No.:   **C 11-00885**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On <u>May 3, 2012</u>, I served the attached

**1.      NOTICE OF MOTIONS AND MOTIONS BY DEFENDANT JEFFREY GOODWIN FOR SUMMARY JUDGMENT AND BY DEFENDANTS PAUL CRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**2.      MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS BY DEFENDANTJEFFREY GOODWIN FOR SUMMARY JUDGMENT AND BY DEFENDANTS PAULCRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**3.      DECLARATION OF AMY LO IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**4.      DECLARATION OF JEFFREY GOODWIN IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**5.      DECLARATION OF EMILY KERAM IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**6.      DECLARATION OF PAUL CRAFT IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**7.      DECLARATION OF JARED ZWICKEY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES**
**8.      [PROPOSED] ORDER GRANTING MOTIONS BY DEFENDANT JEFFREY GOODWIN FOR SUMMARY JUDGMENTAND BY DEFENDANTS PAUL CRAFT AND JEFFREY GOODWIN FOR PARTIAL SUMMARY JUDGMENT OF CERTAIN CLAIMS AND ITEMS OF DAMAGES GOODWIN**

May 3, 2012
Page two
Sean Kensinger v. CHP et.al.
MSJ

by personally delivering a true copy thereof to the following person(s) at the address(es) as follows:

**James Y. Higa**
**HIGA & GIPSON, LLP**
**71 Stevenson St., 4th fl.**
**San Francisco, CA  94105**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 3, 2012, at San Francisco, California.

| Anh Ho | /s/ Anh Ho |
|--------|------------|
| Declarant | Signature |

OK2011900202
20599998